WILLIAM H. STONE *v.* VERNON RUDOLPH, *etc.*

(No. 9573)

*and*

WILLIAM H. STONE *v.* VERNON RUDOLPH, *etc.*

(No. 9574)

Submitted September 27, 1944. Decided December 12, 1944.

Fletcher W. Mann and Hutchins & Parker, for plaintiffs in error.

Frank Love and William L. Lee, for defendant in error.

Fox, Judge:

William H. Stone instituted his action of trespass on the case against Vernon Rudolph, trading and doing business as Krispy Kreme Doughnut Company (hereinafter referred to as "Rudolph") and Holly Hopkins, in the Circuit Court of Fayette County, in which he seeks to recover $25,000.00 damages for personal injuries sustained by him, growing out of a collision between an automobile owned by Rudolph and operated by his employee, Hopkins, and in which plaintiff was a guest-passenger, and a truck parked on the state highway in the Town of Oak Hill in Fayette County, referred to in the record as the "Georgia truck". Plaintiff, in his original declaration, alleges that said collision was brought about by the "careless, reckless and negligent conduct" of defendants in the operation of their automobile; and in his amended declaration, in the second count thereof, that the conduct of Hopkins, under the circumstances alleged, "was gross, wanton and wilfull negligence". There was a trial of the action before a jury, which resulted in a verdict for the plaintiff, and against both defendants, for the sum of $16,000.00, on which, after a motion to set aside had been overruled, the court entered a joint judgment against the defendants, to which action the defendants prosecute separate writs of error, and the

matters arising thereon are heard together in this Court.

Two matters, not bearing upon the merits of the case, need to be considered at this point. The first is the objection raised to the service of process on Rudolph. The cause of action arose in Fayette County, and Hopkins was served with process in that county. At the date of the institution of the action, Rudolph was a nonresident of this State, and plaintiff attempted to secure service of process on him under the provisions of Chapter 47, Acts of the Legislature, 1937, (Michie's Code, 1943, 56-3-31) which in general provides for service upon the auditor of the State in cases where a nonresident operates an automobile in this State. The requirements of the section referred to seem to have been complied with, unless it be that part thereof which requires that notice of such service on the auditor, and a copy of the process, shall be forwarded by the auditor to the defendant by registered mail, and the production of the defendant's return receipt, signed by him or his duly authorized agent, or a showing of the refusal of such registered mail by the addressee, and the return thereof to the auditor's office showing such fact, all of which is required to be appended to the original process, and filed therewith in the clerk's office of the court from which process issued. The facts are that process served on the auditor, or more accurately expressed, accepted by him, was forwarded by registered mail to Vernon Rudolph, Krispy Kreme, in Charleston, West Virginia, and receipted for by one Mary Lou Gregory, who was the wife of Rudolph's manager in the business being conducted by him in Charleston. It is contended that this was not a compliance with the statute, because process was mailed to a point within this State, and that the service of process as to Rudolph is defective. The question was raised, through a special appearance, by motion to quash the return of service, which motion was overruled, and the service held effective. The orders bearing on this point show that on April 26, 1943, Vernon Rudolph, by his attorney, appeared specially and for no other purpose than to renew a motion made at the January

term, 1943, to quash the service of process and return thereof as to him, and that the court refused to quash the service and return, to which Rudolph excepted. The order entered on that day then shows that Rudolph "appeared generally and tendered and asked leave to file an affidavit purporting to show that he is in the military service of the United States." However, at a later date, and at the same term, this order was amended by striking out the word "generally" and substituting the word "specially". We do not think that we are called upon to decide the question whether there was, in the first instance, a valid service of process on Rudolph, because we consider that the subsequent acts of Rudolph and his counsel constituted general appearance. The order entered on April 26, 1943, shows that he appeared generally in the action by pleading the general issue therein, and we do not think the subsequent order which amended that order and substituted the word "specially" for the word "generally" had any effect to change the character of the appearances that were made. It is well settled and no authority is needed for the proposition, that an appearance in a suit or action for any purpose other than one to test the jurisdiction of the court, or the sufficiency and service of a process, is a general appearance. The filing of an affidavit bearing on the contention that defendant was at that time engaged in the military service of the United States, was certainly not an appearance having anything to do with the jurisdiction of the court to try the action, or one having any bearing whatever on the legality of the service. In addition to this, the case was tried on the part of both defendants, and counsel appeared for each of them. This, we think, was a waiver of any defect in the service of the process. See *State* v. *Thacker Coal & Coke Co.,* 49 W. Va. 140, 38 S. E. 539; *Damron* v. *Williamson Construction & Engineering Co.,* 109 W. Va. 122, 153 S. E. 250; 1 Michie's Virginia and West Virginia Digest 583. See also *C. & O. R. R. Co.* v. *Wright,* 50 W. Va. 653, 655, 41 S. E. 147. This was a case in which an appearance before a justice of the peace was considered. It may not be strictly applicable to

an action in the circuit court, but there is a discussion of the principle involved. The case of *Chapman* v. *Maitland*, 22 W. Va. 329, may seem to be in conflict with the decisions cited above, but whatever the rule may have been at one time, we think it clear that, as the law now is, a general appearance after a plea or motion attacking the form of, or the return of service of process waives any defect in the process or the service thereof, on the general theory that the office of a process is to bring a defendant into court and give him notice of the proceeding; and while he may appear specially to attack the form of return of service thereof, he cannot afterwards appear generally for any purpose without a waiver of his objections thereto.

The second question is that relating to the refusal of the trial court to delay the trial of the case on account of the alleged inability of Rudolph to be present at the trial by reason of his engagement in the military service of the United States. The only evidence of such military service is an affidavit on the part of a superior officer, in which it is stated that Rudolph was a coastal patrol pilot. Section 110 of the Soldiers' and Sailors' Civil Relief Act defines persons in the military service as, "All members of the Army of the United States, the United States Navy, the Marine Corps, the Coast Guard, and all officers of the Public Health Service detailed by proper authority for duty either with the Army or Navy." Whether the service in which Rudolph is engaged comes within this definition, we need not decide, because Section 201 of the Act provides for a staying of the action by a litigant during the period of his service, if made by him or on his behalf, "unless, in the opinion of the Court, the ability of the plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service." The provision quoted, of course, gives the trial court discretion as to whether an action shall be stayed, and we do not think that discretion has been abused in this case. The action was called for trial at the January term, 1943, and the trial delayed on account of the absence of Rudolph. When it was again called for

trial at the succeeding term, Rudolph was still absent, and relied upon the same claimed military service. Rudolph knew nothing whatever about the circumstances on which the action was based. According to a statement of one of counsel defending the action, he had not been able to secure helpful cooperation on the part of Rudolph. The manager of Rudolph's business in West Virginia was present and testified on the only material matter of which Rudolph could have had any knowledge, namely, the fact of instructions to Hopkins not to permit riders. We can see no prejudice to Rudolph on account of his absence at the trial, and we are of the opinion, therefore, that it was not error on the part of the trial court not to delay the action on account of his absence.

The undisputed facts in this case are that Rudolph is a nonresident of the State, and conducts a business under the name of Krispy Kreme Doughnut Company, with headquarters in the State of North Carolina, and a branch establishment in Charleston, West Virginia; that defendant Holly Hopkins had been employed by Rudolph some six months prior to the accident in transporting pies, doughnuts, etc., to his trade along the route between Charleston and Beckley, and that he was familiar with the highway between said points; that Hopkins had been instructed by Rudolph's agent, one Gregory, who was present at the trial and testified, not to permit persons to ride in his automobile or truck under any circumstances; that on the morning of July 3, 1942, and before daylight, plaintiff was at Gauley Bridge, some twenty miles north of Oak Hill, and asked and was granted permission to ride with Hopkins in the automobile Hopkins was operating at that time in the Rudolph business. From this point on the evidence is in conflict on certain points. Hopkins says that at the time the plaintiff asked for permission to ride with him, "I told him I was going to Beckley, and I told him if he wanted to take a chance it was all right with me." Plaintiff specifically denies that any such statement was made. The next point of conflict is the condition of the highway, as regards fog, between Gauley Bridge and Oak Hill, the

point of the accident. Hopkins testified, in substance, that the road was covered with a dense fog at points all the way between the point known as Chimney Corner and Oak Hill. He said: "It was pretty hazardous—you couldn't see part of the time". Plaintiff testified, in substance, that there were pockets of fog between those points, but that he did not believe they were of such density as to prevent the driver from seeing the road ahead and operating the automobile. One witness testified that from a point some two miles beyond Fayetteville and in the direction of Oak Hill the fog was very dense on the morning of the accident. The plaintiff made no protest against the operation of the automobile on the part of Hopkins. There was a stop at Fayetteville several miles north of Oak Hill, and, of course, had plaintiff desired to do so, he could have left the automobile at that point, or, if the circumstances warranted, he could have protested against Hopkins' operation of the automobile at any time, but he does not claim to have done so, and we assume, in view of his other testimony, that he saw no reason for doing so. Of course, if there were the dense pockets of fog which Hopkins says existed between Chimney Corner and Oak Hill, a serious question would arise as to whether in remaining in the automobile, plaintiff was guilty of contributory negligence, or, as we think, more properly expressed an assumption of risk. It is quite apparent that astute counsel, representing plaintiff and defendants, were keenly aware of the implications attached to the testimony touching the existence of fog along the highway from Gauley Bridge to Oak Hill, and attempted to present their case accordingly. The accident, in which both plaintiff and Hopkins were injured, occurred at Oak Hill just before day, on July 3, 1942. A truck, probably bearing a Georgia license, and referred to as the "Georgia truck", was parked on the berm on the right side of the highway in the town of Oak Hill. Undoubtedly, there was a dense fog at that point, and Hopkins drove his automobile too far to the right, and off the paved portion of the highway, and struck the Georgia truck parked on the berm. According to plain-

tiff's testimony, the collision occurred immediately after entering the fog. He says it was a matter of seconds, and if that be true, of course, he had no opportunity to protest against Hopkins' driving of the automobile into this fog bank. As stated above, Hopkins was familiar with the road, and plaintiff was not, never having travelled the road prior to that time. There is some evidence that this particular location on the highway is often foggy, and there is an attempt made to attribute this condition to the existence of a ravine leading from Oak Hill down to New River, and a burning slate pile probably some half a mile from the highway. Neither plaintiff nor Hopkins can give any clear explanation as to how the accident occurred, more than to say that the fog prevented them from seeing ahead. Plaintiff says that on the road from Gauley Bridge to Oak Hill, the speed of the automobile was thirty-five or forty miles an hour, while Hopkins says it was twenty-five or thirty miles an hour, but that he slowed to a speed of about twenty miles when he reached Oak Hill, because of a speed limit ordinance then in existence in that town. The crash into the Georgia automobile was with such force as would indicate that Hopkins' automobile was travelling at a rather rapid speed, but whether it exceeded twenty miles an hour is more or less left to conjecture, although the plaintiff testified that he did not think the speed was reduced.

It is apparent that the rules of law governing the right to recover as against Hopkins, who actually operated the automobile, and Rudolph, the owner thereof, are different. When Hopkins permitted the plaintiff to ride in the automobile he undertook to exercise reasonable care to avoid injuring him, and we do not think it necessary to cite authority on that point. This being true, if the evidence is of such character as to warrant a jury in holding that Hopkins failed to exercise such reasonable care, a verdict against him can be justified. The question of whether there has been reasonable care, or lack of it, is primarily and peculiarly one for jury determination, and a jury finding thereon will not be disturbed by this Court, unless from

all the evidence we conclude the same to be clearly wrong. Here we have a case where there is a conflict as to whether Hopkins did exercise reasonable care. If the situation was, as plaintiff testifies, that only pockets of fog were encountered between Gauley Bridge and Oak Hill, and there was no apparent risk in running through these pockets, there was naturally no lack of reasonable care up to the point where the heavier bank of fog was encountered in Oak Hill. On the other hand, if there was heavy fog at points on the highway from Chimney Corner to Oak Hill, as Hopkins states there was, then the plaintiff was probably either guilty of contributory negligence or assumed the risk. The jury had the right to accept the statement of the plaintiff, and find that Hopkins had exercised reasonable care in the operation of the automobile prior to the time of reaching the fog bank in Oak Hill, and acquit him of either contributory negligence or the assumption of risk, and at the same time find that, with his knowledge of the road, in entering this Oak Hill fog bank without reducing the speed of his automobile where collisions with other vehicles could be avoided, Hopkins failed to exercise reasonable care, and this, we think, is what the jury did. As we appraise the case, plaintiff's recovery, even as against Hopkins, must be based upon what happened in Oak Hill, rather than any conduct on the highway before he reached that point; but we think the jury was warranted in finding that Hopkins' conduct in driving into the fog bank at Oak Hill under all the circumstances, and considering his acquaintance with the road, amounted to lack of reasonable care on his part, and we find no grounds for disturbing the jury verdict as to him.

A different question is presented when we consider the verdict against Rudolph. As stated above, Hopkins had been instructed not to permit riders. He violated his instructions and allowed the plaintiff to ride with him. That created a different standard of recovery, and in such a case recovery can only be had where there is wanton, wilful and reckless operation of an automobile by the servant of the owner. That proposition was stated by this

Court in the case of *Christie* v. *Mitchell,* 93 W. Va. 200, 116 S. E. 715, wherein it was held that,

> "A master is not liable for personal injuries sustained by one invited by his servant to ride on his truck without actual or ostensible authority to do so, when not acting within the scope of his duties."

> "But notwithstanding this general rule, if such servant after so inviting one to ride with him, and while operating such truck within the general scope of his authority, does so in a wanton, wilful and reckless manner and thereby injures his invitee, the master is liable for the injuries thus inflicted."

> "The general rule is that a master owes no other duty to one who is a trespasser or a mere licensee or invitee of his servant except not to wantonly and wilfully injure him."

This same principle was announced in *Todorobak* v. *McSurley,* 107 W. Va. 372, 148 S. E. 323, and the principle is referred to in *White* v. *Hall,* 118 W. Va. 85, 188 S. E. 768; and *Shrimplin* v. *Simmons Auto Co.,* 122 W. Va. 248, 9 S. E. 2d 49. We think, therefore, that to justify a recovery against Rudolph in this case there must be a showing of such facts as would warrant the jury in holding that Hopkins, the driver of Rudolph's automobile, was guilty of wanton and wilful misconduct, sometimes referred to as wanton and wilful negligence, and this requires some investigation as to what is meant by wilful and wanton misconduct.

Wanton negligence is defined in Black's Law Dictionary, 3rd Ed. 1233, as "Reckless indifference to the consequences of an act or omission, where the party acting or failing to act is conscious of his conduct and, without any actual intent to injure, is aware, from his knowledge of existing circumstances and conditions, that his conduct will inevitably or probably result in injury to another." And in the same work on page 1234, it is stated that " 'Willful negligence' implies an act intentionally done in disregard of another's rights, or omission to do something to protect

the rights of another after having had such notice of those rights as would put a prudent man on his guard to use ordinary care to avoid injury." A wilful act is an intentional act, and, strictly speaking, there can be no such thing as wilful negligence, because negligence conveys the idea of inadvertence as distinguished from premeditation or formed intention. In 38 Am. Jur. 692, it is said: "An omission to exercise care which amounts to a lack of regard for the safety of others is wilful or wanton. Wilfulness or wantonness imports premeditation or knowledge and consciousness that injury is likely to result from the act done or from the omission to act. Wilful, malicious, or intentional misconduct is not, properly speaking, within the meaning of the term 'negligence'. Negligence and wilfulness are mutually exclusive terms which imply radically different mental states. 'Negligence' conveys the idea of inadvertence as distinguished from premeditation or formed intention. An act into which knowledge of danger and wilfulness enter is not negligence of any degree, but is wilful misconduct. The term 'negligence', unqualified, covers all those shades of inadvertence which range between deliberate intention on the one hand and total absence of responsible consciousness on the other but as long as the element of inadvertence remains in conduct, it is not properly regarded as wilful. According to some authorities, there is no such thing as 'wanton negligence', and the designation of wanton acts as 'gross negligence' is a misnomer, because such acts are not negligence at all. Wanton misconduct is positive in nature, while mere negligence is materially negative."

It was held in *Todorobak* v. *McSurley, supra,* that "To constitute wanton negligence, it is not necessary that there should be ill will toward the person injured; but an entire absence of care for the safety of others, which exhibits its indifference to consequences, establishes legal wantonness. Such a mental attitude distinguishes wrongs caused by wanton negligence from torts arising from mere negligence." We assume this same rule could be applied to what may be termed "wilful negligence" as well.

'On the theory that a showing of wilful and wanton negligence on the part of Hopkins was necessary to be made to justify recovery against Rudolph, the court, at the instance of the plaintiff, gave instructions Nos. 4 and 5, which read as follows:

"The court instructs the jury that if you believe from the evidence in this case that Holly Hopkins on the occasion of the accident and immediately prior thereto was guilty of gross willful and wanton negligence in the operation of said automobile, and that as the sole proximate result of said gross willful and wanton negligence the plaintiff was injured, then it would be the duty of the jury to return a verdict for the plaintiff and against the defendants Holly Hopkins and Vernon Rudolph, trading and doing business as Krispy Kreme Doughnut Company."

and

"The court instructs the jury that by gross willful and wanton negligence is not meant that there was necessarily any ill will toward the plaintiff; but an entire absence of care for the safety of others, which exhibits itself in indifference to consequences, established gross wanton and willful negligence."

It is contended by plaintiffs in error that the use of the word "gross" in connection with wilful and wanton negligence was improper, for the reason that gross negligence is negligence of a lesser degree than wilful and wanton negligence or misconduct, and there is authority for this proposition. In *Altman* v. *Aronson,* 231 Mass. 588, 121 N. E. 505, it was held that "Gross negligence * * * falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong."; and in *Sorrell* v. *White,* 103 Vt. 277, 153 A. 359, it is said, "There is a distinction between them. Wilful negligence is a greater degree of negligence than gross."; and in *Turk* v. *Railway Co.,* 75 W. Va. 623, 84 S. E. 569, it was held: "An action for wilful injury is not supported by a finding

that the injury was the result of gross negligence." We think, therefore, that the use of the word "gross" was not proper, but we cannot say that it was prejudicial, because, in the connection in which it was used, the instruction itself does nothing more than say that gross, wilful and wanton negligence are required, which, to our mind, is not an instruction that gross negligence, alone, would warrant a recovery against Rudolph.

Another objection to instruction No. 4 is that it ignores the duty of the plaintiff to use ordinary care for his own safety, and that plaintiff may have been guilty of wilful contributory negligence. As we understand the law, where there is wanton or wilful misconduct, the doctrine of contributory negligence has no place. In 3 Cooley on Torts, Section 484, the rule is said to be, "Where the conduct of the defendant is wanton and wilful, or where it indicates that degree of indifference to the rights of others which may justly be characterized as reckless, the doctrine of contributory negligence has no place whatever, and the defendant is responsible for the injury he inflicts irrespective of the fault which placed plaintiff in the way of such injury." In 45 C. J. page 981, Section 533, it is said, "Where wilful or wanton conduct for which defendant is responsible is the proximate cause of the injury complained of, contributory negligence does not bar recovery"; and in 38 Am. Jur. 854, the rule is stated to be that, "There is an abundance of authority for the proposition that contributory negligence is not a defense in an action based upon wilful or wanton misconduct or intentional violence. Even in jurisdictions where the doctrine of comparative negligence is rejected as a general principle of the common law, contributory negligence is no defense to an action based on the defendant's reckless, wilful, wanton, or intentional misconduct." In view of these authorities, we see no error in the giving of these instructions, and, therefore, the question to be decided is whether Hopkins was guilty of wanton and wilful misconduct, divorced from any consideration of whether plaintiff might have been guilty of contributory negligence, or assumption of risk.

We are of the opinion that the evidence and circumstances considered by the jury did not warrant it in finding the existence of facts on which a verdict against Rudolph can be justified. This verdict necessarily implies that the jury believed that wilful and wanton misconduct had been established. The question presented is not without its difficulties, but an investigation of the authorities, many of which are cited in the briefs, brings us to the conclusion that the elements of wanton and wilful misconduct, sufficient to sustain the verdict, are not here present. In *Thomas* v. *Snow,* 162 Va. 654, 174 S. E. 837, 839, it is held: "Negligence conveys the idea of heedlessness, inattention, inadvertence; willfulness and wantonness convey the idea of purpose or design, actual or constructive. In some jurisdictions they are used to signify a higher degree of neglect than gross negligence. 'In order that one may be held guilty of wilful or wanton conduct, it must be shown that he was conscious of his conduct, and conscious, from his knowledge of existing conditions, that injury would likely or probably result from his conduct, and that with reckless indifference to consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result.' 29 Cyc. 510." In *Friedman* v. *Jordan* 166 Va. 65, 184 S. E. 186, it was held that, "Wilful or wanton conduct embrace knowledge and consciousness that injury will result from the act done, which must be intended or must involve reckless disregard for rights of another and will probably result in injury." In *Hunter* v. *Preston,* 105 Vt. 327, 166 A. 17, 21, the Court said: "The evidence against Midgley made a case for the jury on the question of gross negligence, but not on the question of wilful negligence. To be wilfully negligent, one must be conscious of his conduct, and although having no intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury. That Midgeley was conscious of his conduct, that is, that he knew the condition of the street, the condition of his chains, his speed, the

effect of Hinsdale's lights on his vision, cannot be doubted; but neither he nor those riding with him knew that Preston's car was in his pathway until it was too late to avoid hitting it. He could not, therefore, have been conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct would naturally and probably result in injury. The evidence did not show such an intentional disregard of a known duty necessary to the safety of the person or property of another as to make a case of constructive or legal wilfulness." In *Bowen* v. *Hartford Accident & Indemnity Co.*, 122 Conn. 621, 191 A. 530, an automobile driver was held not guilty of reckless misconduct, within the statute authorizing recovery by a guest, where he fell asleep while driving, thereby causing his automobile to leave the road and crash into a telephone pole, there being no evidence that the driver was tired or sleepy, or that he had any warning that sleep was likely to overtake him. This bears on the intimation in the record that Hopkins may have been asleep, and if so that fact would, in the circumstances of this case, convict him of reckless or wanton and wilful misconduct.

We think that in this case the plaintiff should be held to be barred by his own testimony. Evidently, the jury believed the plaintiff's testimony; otherwise they could not have found the verdict they returned. From the plaintiff's evidence, we would be compelled to conclude that there was no lack of even reasonable care on the part of Hopkins, up to the time he ran into the fog bank at Oak Hill. On that theory of the case, we have acquitted the plaintiff of any contributory negligence or assumption of risk, in connection with the operation of the automobile, up to the time it reached Oak Hill; and his testimony that the accident occurred within a matter of seconds after they entered the fog bank at Oak Hill, relieves him of what might otherwise have been a duty to protest, or to take any other action for his own safety. If we consider plaintiff's testimony in the light most favorable to him, we must also consider it when it is unfavorable; and so it is that we come to the point of the accident without any

proof of any misconduct on the part of Hopkins. If he was derelict in any duty to the plaintiff, it was his failure to take proper care immediately before the accident occurred. If Hopkins had been running through dense pockets of fog all the way from Chimney Corner, he was certainly guilty of lack of ordinary care, and plaintiff must have known that, and it was his duty either to protest or to leave the automobile when he had an opportunity to do so. But we think we are justified, in view of the jury's verdict, in holding that this was not the situation, and that the fog on the road north of Oak Hill did not prevent the operation of the automobile with reasonable safety. If that be true, then Hopkins had a right to assume that the fog at Oak Hill would not be different from that he had encountered theretofore. Of course, the driver of any automobile must take into consideration the possibility that there may be obstacles or vehicles on the highway in front of him, and must take reasonable care to keep his vehicle under control so as not to cause a collision; but is failure to do so wanton and wilful misconduct? If it were shown that Hopkins knew that there was a vehicle in front of him, or that there would probably be a vehicle or other obstacle in front of him, it would have been his duty to guard against a collision, and it would have been reckless, wanton and wilful misconduct not to do so. But there is nothing in the record to indicate that he had any knowledge that the Georgia truck or any other obstacle was in front of him, and he could not have had any intent in respect thereto; nor is there anything to indicate that he knew there were probably vehicles there which he might strike. If he drove the automobile on the right side of the highway, as the plaintiff testifies he did, the probability of colliding with other vehicles was lessened. The accident occurred not because he collided with a vehicle on the paved portion of the highway, but through leaving the pavement and going on the berm. This, we think, must have been an inadvertent, as distinguished from an intentional, act, and there was no element of wanton or wilful misconduct. It is reasonable to assume that he thought

he could pass through this fog bank in the same way he had passed through others along the way from Chimney Corner to Oak Hill, although from his knowledge of the road it may be contended that he should have expected that this fog bank was different from the others. What was in Hopkins' mind is conjectural, but certainly the record does not show that he intended to leave the paved portion of the highway, and that is what caused the accident. There is, in our opinion, lacking a reckless intent and indifference to consequences which are required to constitute wanton and wilful misconduct, but merely a case of one taking the risk of the road ahead with no intent or purpose to injure anyone, himself included, and without any thought that his conduct would result in injury to any one, but the taking of which risk turned out, in this instance, to be disastrous. It may be said that inasmuch as we sustain the jury's verdict as against Hopkins for lack of ordinary care on a conflict of testimony, why not also sustain the verdict of the jury on the question of wanton and wilful misconduct? So far as we can see there is no conflict in the testimony as to what happened at Oak Hill. It therefore becomes a question of law for the Court to determine whether what happened there constituted wanton and wilful misconduct. In our opinion, the evidence does not sustain the verdict of the jury on that point.

There was a verdict against both defendants, and a joint judgment rendered thereon. What we have said indicates the view of the Court that the verdict and judgment were proper as to Hopkins, and unwarranted as to Rudolph. There are separate writs of error, but even if joint this Court may affirm or reverse in whole or in part. Code, 58-5-25. At common law the verdict of a jury could not be set aside as to one defendant, and judgment rendered as to the other, and it was so held in *Tracy* v. *Cloyd,* 10 W. Va. 19. However, this rule has been changed, and in *Pence* v. *Bryant,* 73 W. Va. 126, 80 S. E. 137, it was held that, "Where, in a joint action for tort against three persons, who unite in the same pleas, the jury finds generally against all of them, the Court may, in passing on their

motion for a new trial and the plaintiff's motion for judgment on the verdict against two (naming them), whose guilt the evidence establishes, and to dismiss as to the other, render such judgment as to the two defendants, and set aside the verdict as to the third, of whose guilt there is no proof."; and this principle has been followed in *Blevins* v. *Bailey*, 102 W. Va. 415, 135 S. E. 395; and *Mason* v. *Bluefield*, 105 W. Va. 209, 141 S. E. 782.

We therefore affirm the verdict of the jury, and the judgment of the Circuit Court of Fayette County based thereon, as to the defendant, Holly Hopkins; and we reverse the judgment of said court in entering judgment against Rudolph on the verdict aforesaid, set aside the verdict as to him, and remand the case to said circuit court for a new trial of the action as to Rudolph.

> *Judgment affirmed as to Holly Hopkins; judgment reversed as to Vernon Rudolph; verdict set aside; new trial awarded.*

KENNA, JUDGE, dissenting:

References to this record are made quite confusing by the fact that the order entered on April twenty-ninth, the day upon which the verdict was returned, makes a matter of record the proceedings of that day and those of April twenty-sixth as well, without referring to April twenty-seventh. The decidedly-better method is to enter a separate order for each day that anything has occurred in the case deserving recognition of record, thus preserving a distinct chronology. Otherwise, as here, accurate, but incomplete, references may confuse.

As to Rudolph's premature so called general appearance and the later entry of his plea to the merits, he asked to have the order corrected so that it would show that instead of appearing "generally", as the order states, for the purpose of raising the question of defective service of process, he appeared "specially" for that purpose. However, the same order shows that after his motion to quash had been overruled, he entered a plea of "not guilty",

announced ready for trial, and submitted the matter to a jury. It is plain that he thereby waived all matters concerning defective service of process, as well as mere irregularities in the process itself, both being merged in his plea to the merits. Consequently it is immaterial whether his prior appearance was special or general.

As to his motion to stay the proceedings due to the fact that he was serving in one of the branches of the service named in the "Soldiers and Sailors Civil Relief Act" (they being the Army, Navy, Marine Corps, Coast Guard and Offices of the Public Health Service, formally assigned to duty with the Army or the Navy), although it is true that this record discloses no abuse of discretion on the part of the trial judge in this connection and consequently shows no prejudicial error therein, I nevertheless think that this Court does not reach that question on this record. That for the simple reason that Rudolph has failed to make the required showing that he is serving in a branch of one of the services specifically named in the Act of Congress. He did file an affidavit stating that First Lieutenant Vernon C. Rudolph was a C. A. P., (Civil Air Patrol) Coastal Patrol Pilot on active duty assigned to the 16th Task Force based at Naval Air Station, Manteo, North Carolina, that unit being under the direction Twenty-fifth Air Wing, Anti-Submarine Command, Army Air Forces, 20 Church Street, New York City. No effort was made to connect the Civil Air Patrol with any of the organizations named in the act. Having failed to bring himself within the terms of the act, the trial court was not required to decide and did not decide, nor did the parties base their contentions upon, the extent to which his defense might be materially affected by reason of his service.

I am of the opinion that the majority is not attaching to the verdict the weight to which it is entitled. Clearly, there having been found no error in instructions nor specific rulings of the trial court, the verdict could be set aside only because, in the judgment of the majority, it, as a matter of fact, conflicted, not with the possible, but with the clear, weight of the evidence. In speaking of the

verdict against Hopkins, the opinion says that under certain circumstances "a verdict against him can be justified". To my mind, the majority opinion would have "justified" a verdict if it had been for the defendant; but the verdict here was for the plaintiff. This review is not an attempt to justify the verdict, but the verdict against both must stand unless affirmatively shown to involve apparent error.

Again, in speaking of the testimony of Stone, the opinion treats it as entitled to the same weight when unfavorable to his recovery as it is when in his favor. In my opinion, this is not true after verdict, the jury being the judge of the weight to be attached to the statements of fact made by all witnesses, and of the reasons lying behind exaggerations or inaccuracies, and of the effect to be given to surrounding circumstances. Stone was severely injured, having been rendered completely unconscious for a large part of the time immediately following the collision, and semi-conscious for a few minutes. He stated that after having gone through a number of fog pockets not thick enough to interfere with vision, at Oak Hill the Krispy Kreme truck drove into a patch of fog which "seemed to grow in intensity as we entered this very low section; I don't know what the name of it is. This one point seemed to be one pocket of fog, and it seemed to be very light on the outside and growing in intensity as we went onward." R., 116,-7. He states that the collision "happened on the spur of the minute, a matter of seconds". There is other evidence as to the frequency of more dense fog banks in this particular neighborhood during the early hours of the morning than elsewhere on the road to Fayetteville. I repeat, it was the jury's prerogative, under all of the surrounding circumstances, including the fact that during the few moments spent in the fog bank where the accident occurred, Stone's mind ceased to function, to attach what they consider the proper weight to the different parts of his testimony.

Stone had never been on the road before. He knew nothing, and Hopkins told him nothing, about it.

On the other hand, let us look at the testimony of Hopkins, who was not severely hurt nor temporarily deprived of the full use of his faculties. He had delivered upon this same route, with the same truck, at the same hour, one hundred and forty-four times or six times a week during the immediately preceding six months. He had returned, of course, at a different hour, a like number of times. He was thoroughly acquainted with the road and with its condition in good weather and bad. The record does not show whether he had additional daily routes to cover nor the time in which he was scheduled to go from Charleston to Beckley and return, but I think it is not an unwarranted assumption to conclude from the whole proof that he was supposed to make the trip that he was on at the time of the collision in a certain length of time and that he was undertaking to do so at the time of the collision. On his examination in chief Hopkins testified concerning the visibility:

"Q. What was the condition of the weather and visibility that morning, Mr. Hopkins?

A. It was very foggy that morning from Gauley Mountain practically all the way through.

Q. Where did you first run into the fog?

. A. About the New River canyon.

Q. How far was that before you got to Oak Hill?

A. It was about—I will say about fifteen miles.

Q. What was the density of the fog? How foggy was it?

A. It was pretty hazardous. You couldn't see part of the time.

Q. You are not talking loud enough.

A. You couldn't see part of the time where you was at.

Q. Now, did that condition exist all the way from New River gorge over the fifteen miles between there and the scene of the accident?

A. Yes, sir.

Q. Please tell the jury at what speed you were driving from Gauley Bridge to the scene of the accident.

A. Well, I was, until I hit Oak Hill, I was driv-

ing, I expect, around twenty-five or thirty miles an hour.

Q. And did you continue to drive at about the same speed up to and including the time of the accident?

A. No, sir. I always lower my speed through Oak Hill. They have a twenty-mile speed limit."

Apparently Hopkins' realization of what he said was a continuous hazard due to fog from New River to Oak Hill was his reason for telling Stone, according to Hopkins, that he would give him a ride if Stone wished to "take a chance". The jury could have concluded from Hopkins' experience and this testimony that Hopkins intended to drive through dense fog in disregard of the safety of others on the road or in vehicles, including the one that he was driving, at between twenty-five and thirty miles an hour. According to Hopkins that is exactly what he did. According to Stone's theory, he did not strike dense fog until he reached Oak Hill, where Hopkins had reason to expect it. A circumstance that the jury may have regarded as controlling in deciding whether to believe Hopkins or to believe Stone concerning the location and denseness of the fog and Stone's statement that the pockets of fog they encountered before they reached Oak Hill were quite light compared to the bank of fog they entered at Oak Hill, is the fact that Hopkins remained on the hard surface of the road all the way until he entered Oak Hill. Exactly where he left the surface does not appear. The uncontradicted testimony is to the effect that the Georgia truck was parked entirely off the hard surface, and that Hopkins therefore was not on the road when he struck it. No like circumstance is shown at any other point. Concerning Hopkins' credibility, and comparing his cross examination with his statement in chief, Hopkins had this to say, in part, when examined by the attorney for the plaintiff:

"Q. Now, Mr. Hopkins, do you mean to tell this jury that when you hit that truck over there and knocked it up over a six-inch sidewalk curbing, skidded it forward into a telephone pole, and

did all that damage to your truck, that you were traveling twenty miles an hour?

A. I wasn't going over that.

Q. Not going over that?

A. No, sir. I couldn't see to drive any faster.

Q. Couldn't see to drive any faster?

A. That's right.

Q. Well, the fog was the same thickness, I believe you say, over there that it was down here?

A. That's right.

Q. Well, you could see down here to drive thirty miles an hour.

A. Well, that was an open highway down here.

Q. How is that?

A. That was an open highway down here.

Q. That wouldn't affect your ability to see any, would it?

A. It would in town.

Q. How is that?

A. It would in town.

Q. Could you see better down here than you could in town?

A. Sure.

Q. Why was that?

A. Well, there wasn't no lights to blind me or anything.

Q. No lights to blind you?

A. That's right.

Q. If the fog was so thick over there that you couldn't see but about ten feet, there wouldn't be any lights to blind you, would there?

A. Street lights.

Q. I know, but you couldn't see but ten feet, could you?

A. Well, you could always see the light. It will blind you before you can see it.

Q. Well, the street lights over there, then, would blind a person?

A. I imagine they would.

Q. Through that fog. And I believe you tell the jury that that place over there wasn't any worse for fog than any other place through this section?

A. From the New River canyon.

Q. How is that?

A. From the New River canyon that way, it wasn't.

Q. And you had been driving this route six

days every week for six months immediately preceding this, and that is your observation, that the fog wasn't any worse any place else than it was over there?

A. That's right.

Q. Or wasn't any worse there than any place else?

A. That's right."

As between Hopkins and Stone and their different versions of the happenings immediately preceding the accident, the jury was justified in disbelieving Hopkins entirely. He being the defendant's principal witness, if that be true, the jury was further justified, if they wished, in concluding that the defense's theory of the basic facts was largely imaginary.

To my mind it is unnecessary in this matter to reach an abstract conclusion as to what constitutes wanton and wilful wrongdoing. The decided cases are completely out of harmony, as can be discovered by examining the cases cited in the Am. Jur. notes to sustain the quotation in the majority opinion. In my opinion the quotation is rather incoherent, as will be found to be the case in the use of all reference works based upon case law when the leading cases are not in agreement. What is frequently spoken of as "wilful negligence" does not require the presence of an intention to injure. Malice is not an element. The conduct must be of known danger to others and in flagrant disregard of its probable consequence upon their safety. In addition to the *Todorobak* case, see also *Keystone Manufacturing Co.* v. *Hines,* 85 W. Va. 405, 414, 102 S. E. 106. What I believe to be a comparatively clear and brief statement will be found in *Iaconio* v. *D'Angelo,* 104 N. J. L. 506, 142 Atl. 46, 58 A. L. R. 14, as follows: "Wilful or wanton injury can only be established by showing that one, with knowledge of existing conditions, conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act, or omits to discharge some duty, produces the injurious

result. *Staub* v. *Public Service Railroad Company,* 97 N. J. L. 297, 23 A. L. R. 440, 117 Atl. 48."

Though based upon a partly different principle, especially where the doctrine of *respondeat superior* is involved, I have found clarifying the discussion of gross negligence and of wanton and wilful misconduct in the opinions dealing with exemplary damages. See *Milwaukee, Etc. R. R. Co.* v. *Arms, et al.,* 91 U. S. 489, 23 Law Ed. 374; *Baker* v. *Ohio River R. Co.,* 51 W. Va. 423, 41 S. E. 148, 90 Am. St. Rep. 808; and 98 A. L. R. 267 and other annotations there cited.

Believing that it has not been clearly shown by the plaintiff in error that the verdict is not supported by sufficient evidence as to Rudolph, I would affirm the judgment of the court below. Judge Lovins authorizes me to say that he joins in this dissent. He and I concur in affirming the judgment against Hopkins.