246 S.E.2d 907 (1978)
James MANDOLIDIS et al.
v.
ELKINS INDUSTRIES, INC.
Carl Ray SNODGRASS
v.
UNITED STATES STEEL CORP.
Mary Kay DISHMON, Admx.
v.
EASTERN ASSOCIATED COAL CORP.
Nos. 13926, 13982 and 13983.
Supreme Court of Appeals of West Virginia.
Decided June 27, 1978.
Dissenting Opinion July 11, 1978.
Concurring Opinion August 15, 1978.
*909 Cardot, Kent & Queen, James A. Kent, Jr., Elkins, Calwell, Steele, McCormick & Peyton, W. Stuart Calwell, Jr., Nitro, for appellants in No. 13926.
Brown, Harner & Busch, John F. Brown, Jr., Elkins, for appellee in No. 13926.
DiTrapano, Mitchell, Lawson & Field, John R. Mitchell, Charleston, for appellants in No. 13982.
Steptoe & Johnson, Edward W. Eardley, Charleston, for appellee Baker, in No. 13982.
Kay, Casto & Chaney, Don R. Sensabaugh, Jr., Charleston, for appellee P. A. Drill, in No. 13982.
Love, Wise, Robinson & Woodroe, Charles M. Love and David A. Faber, Charleston, for appellee U. S. Steel, in No. 13982.
Edward G. Atkins, Charleston, for appellant in No. 13983.
Shaffer, Theibert, Ikner & Schlaegel, H. G. Shaffer, Jr., Madison, for appellee in No. 13983.
Spilman, Thomas, Battle & Klostermeyer, Lee F. Feinberg and James H. Davis, III, Charleston, amicus curiae for WV Manufacturers Ass'n.
Jackson, Kelly, Holt & O'Farrell, John L. McClaugherty and Alvin L. Emch, Charleston, amicus curiae for WV Farm Bureau; WV Homebuilders Assoc.; WV Retailers Assoc.; WV Auto. Dealers Assoc.; WV Chamber of Commerce; WV Coal Assoc.; WV Surface Mining and Reclamation Assoc.; WV Oil and Natural Gas Assoc.; WV Motor Truck Assoc.; Contractors Assoc. of WV; and WV Restaurant and Licensed Beverage Assoc.
James B. McIntyre, McIntyre & Jordan, Charleston, amicus curiae for WV Labor Federation, AFL-CIO.
George G. Burnette, Jr., Charleston, amicus curiae for Dist. 17, United Mine Workers of America.
Ross Maruka, Fairmont, amicus curiae for Dist. 31, United Mine Workers of America.
Harrison Combs, Washington, D. C., James M. Haviland, Charleston, amicus curiae for International Union, United Mine Workers of America.
*908 McGRAW, Justice:
For purposes of decision, the Court has consolidated three cases here on writs of *910 error. Each case involves a tort action brought by employees or their heirs against employers subject to this state's Workmen's Compensation Act.
Each action arises from injuries or deaths suffered by employees during the course of and as a result of their employment. Notwithstanding the immunity from common law suit granted to employers by W.Va. Code § 23-2-6,[1] plaintiffs commenced their actions relying on the deliberate intent exception to such immunity contained in W.Va.Code § 23-4-2.[2]

I
The validity vel non of the trial courts' judgments, in the cases at bar, can only be ascertained by an examination and analysis of the substantive law as set forth in W.Va. Code § 23-4-2. That provision by its express language preserves for employees a common law action against employers "as if this chapter had not been enacted" "if injury or death result to any employee from the deliberate intention of the employer to produce such injury or death." In these appeals, this Court is asked to delineate the extent to which this statutory provision provides immunity to employers subject to the Act. The individual parties to these actions, as well as various employer and labor organizations filing amicus curiae briefs, urge us to employ familiar and competing rules of statutory construction to ascertain the intent of the Legislature in enacting this provision in 1913. What must be remembered is that canons of construction are but aids devised by courts to ascertain the true meaning, purpose and intent of the Legislature. What was the intention of the original section? The answer to this specific question can best be answered by recalling the purpose for the enactment of workmen's compensation legislation in the first instance.
The paramount reason for such legislation was, of course, that under the common law tort system workers injured in industrial accidents recovered compensatory damages in a rather small percentage of cases.[3]
The common law tort system with its defenses of contributory negligence, assumption *911 of risk and the fellow servant rule was considered inimical to the public welfare and was replaced by a new and revolutionary system wherein "fault" became immaterialessentially a no-fault system.
The Workmen's Compensation Act was designed to remove negligently caused industrial accidents from the common law tort system.[4] This quote from an earlier Workmen's Compensation decision provides additional historical perspective and insight as to the purpose of this law:
"The conditions giving rise to a law, the faults to be remedied, the aspirations evidently intended to be efficiently embodied in the enactment, and the effects and consequences as regards responding to the prevailing conceptions of the necessities of public welfare, play an important part in shaping the proper administration of the legislation. In the aggregate, they sometimes shed very efficient light in aid of clearing up obscurities as to the legislative intent ... The courts should fully appreciate that and be imbued with and guided by the manifest intent of the law to eradicate, utterly, the injustice to employers and employees, and the public as well, of the old system, and to substitute in its place an entirely new one based on the highest conception of man's humanity to man and obligation to industry upon which all depend; recognizing the aggregate of its attending accidents as an element of cost to be liquidated and balanced in money in the course of consumptiona system dealing with employees, employers, and the public as necessarily mutual participants in bearing the burdens of such accidents, displacing the one dealing only with the class of injuries happening through inadvertent failure, without real moral turpitude, to exercise average human care, and placing employee and employer, whose interests are economically the same, in the false position of adversaries, to the misfortune of both and the public, intensified by opportunity for those concerned as judicial assistants to profit by such misfortunes. Most lamentable it will be, if this new systemso freighted with hopes for the minimizing of human burdens and their equitable distributionshall not endure and be perfected to the best that human wisdom can attain." McVey v. Chesapeake & Potomac Telephone Co., 103 W.Va. 519, 522-3, 138 S.E. 97, 98 (1927) quoting Milwaukee v. Miller, 154 Wis. 652, 144 N.W. 188 (1913) (Emphasis supplied).
We now turn to an analysis of our case law construing this statute. In Collins v. Dravo Contracting Co., 114 W.Va. 229, 171 S.E. 757 (1933), the Court rejected the proposition that an employer could never "deliberately intend" to cause an injury or death by an act of omission,[5] and held that under *912 W.Va.Code § 23-4-2 a personal representative may prosecute a wrongful death action on behalf of a decedent employee's widow, widower, child or dependent, because such provision provides a right of action "as if this chapter [Workmen's Compensation Act] had not been enacted." Moreover, the Court held plaintiff's common law declaration sufficient "to require the defendant to go to trial upon the theory of deliberate intent to injure or kill." Id. at 236, 171 S.E. at 759.
Less than a year later this Court was asked again to rule on the legal sufficiency of a declaration in Maynard v. Island Creek Coal Co., 115 W.Va. 249, 175 S.E. 70 (1934), and in syllabus point 1 thereof it was held:
Allegations in a declaration of acts of gross negligence by the employer do not constitute deliberate intention within the meaning of the said statutory provision. To bring a case within said provision, at the very least, there must be alleged facts from which the natural and probable consequence reasonably to be anticipated would be death or serious injury to the employee affected thereby.
In addition, the Court stated that "[a] subscribing employer who has ... complied with the statute is absolutely exempted from liability to employees for injuries received by them in the course of and resulting employment, except, if such injuries be willfully inflicted by the employer ..." Id. at 252, 175 S.E. at 71. (emphasis supplied) And, more than that, the Court said "that the carelessness, indifference, and negligence of an employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury." Id. at 253, 175 S.E. at 72.
It is clear from this language that the Maynard court did not, in construing the statute, conclude that a showing of specific intent to injure or kill was required to avoid the workmen's compensation immunity bar. The Court correctly rejected the idea that gross negligence was equivalent to "deliberate intent," and it is apparent that the Court did not believe the Legislature intended to shield an employer from common law liability where such employer knowingly and wantonly placed an employee in such a condition of peril that serious injury or death would in all probability occur to such employee. It is irrefutable that the Collins and Maynard courts construed the statute so as to allow a jury to consider the culpability of an employer's conduct where such employer subjected an employee to working conditions in which the natural and probable consequences to be anticipated would be death or serious injury. As Justice Wilson observed in his concurring opinion in Eisnaugle v. Booth, W.Va., 226 S.E.2d 259 (1976):[6]
When this language [W.Va. § 23-4-2] was first confronted by this Court, it seemed that it was viewed reasonably and was interpreted as to give an employee the benefit of a cause of action left open to him by the statute. Although the standards of pleading and proof were intended to be strict, there was no apparent effort to define "deliberate intention" in such terms as to impose what now amounts to a higher standard of pleading and proof than would be required in pleading and proving a charge of murder. Id. at 262.
Yet, just two years after Maynard, in Allen v. Raleigh-Wyoming Mining Co., 117 W.Va. 631; 186 S.E. 612 (1936), the Court read the same statutory provision so as to preclude any recovery by an employee under such provision unless there was a showing of "[a] specific deliberate intent on the part of the latter to produce the injury..." Sec also, Brewer v. Appalachian Constructors, Inc., 135 W.Va. 739, 65 S.E.2d 87 (1951).
That opinion, however, is totally devoid of discussion concerning the legislative purposes underlying workmen's compensation legislation. The Court simply relied on judicial *913 decisions interpreting substantially identical provisions contained in the Washington and Oregon laws, and invoked the rule that in construing statutes adopted from another state, "the judicial interpretation already placed on that statute by the highest tribunal of such state will usually be adopted." Id. 117 W.Va. at 636, 186 S.E. at 614. An examination of those cases reveals that the definition of "deliberate intent," as used in their workmen's compensation laws, was arrived at by examining the definition given to such terminology in a murder statute. See, Jenkins v. Carman Manufacturing Co., 79 Or. 448, 155 P. 703 (1916), and the cases cited therein.
In Collins the Court was urged by the employer[7] to interpret the statute, based on the same Oregon and Washington cases relied on in Allen, to require a specific intent to injure or kill but, and we think correctly so, the Court declined to do so. We are of the opinion that reading the language of the provision under review here to mean the same thing as similar wording in a criminal statute defining murder is contrary to the basic rules governing the construction of workmen's compensation statutes. There is no adequate justification for adhering to the construction of a statute which is not only erroneous but which works an injustice on persons injured as a result of conduct which is so likely to produce injury or death that its performance, under all circumstances, could perhaps warrant criminal liability.[8] No person or organization of persons should be permitted to escape full responsibility for conduct which could be found to be criminal in nature. We do not, however, wish to and we do not intimate any view as to the nature of conduct involved in the three cases now here on review.
In light of the conditions giving rise to the passage of the Act, and in light of the purposes of the Act, we believe the Collins and Maynard courts correctly interpreted the statute, and the Allen court's interpretation was erroneous and cannot continue to represent the law in this state.
The workmen's compensation system completely supplanted the common law tort system only with respect to negligently caused industrial accidents, and employers and employees gained certain advantages and lost certain rights they had heretofore enjoyed. Entrepeneurs were not given the right to carry on their enterprises without any regard to the life and limb of the participants in the endeavor and free from all common law liability.
The law of this jurisdiction recognizes a distinction between negligence, including gross negligence, and wilful, wanton, and reckless misconduct. The latter type of conduct requires a subjective realization of the risk of bodily injury created by the activity and as such does not constitute any form of negligence. As this Court said in Stone v. Rudolph, 127 W.Va. 335, 346, 32 S.E.2d 742, 748 (1944), citing 38 Am.Jur. 692:

*914 Wilfulness or wantonness imports premeditation or knowledge and consciousness that injury is likely to result from the act done or from the omission to act. Wilful, malicious, or intentional misconduct is not, properly speaking, within the meaning of the term `negligence.' Negligence and wilfulness are mutually exclusive terms which imply radically different mental states. `Negligence' conveys the idea of inadvertence as distinguished from premeditation or formed intention. An act into which knowledge of danger and wilfulness enter is not negligence of any degree, but is wilful misconduct.
In our view when death or injury results from wilful, wanton or reckless misconduct such death or injury is no longer accidental in any meaningful sense of the word, and must be taken as having been inflicted with deliberate intention for the purposes of the workmen's compensation act.
In light of the foregoing discussion, the phrase "deliberate intent to produce such injury or death" must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort[9] or wilful, wanton, and reckless misconduct. See Barr v. Curry, 137 W.Va. 364, 71 S.E.2d 313 (1952); Stone v. Rudolph, 127 W.Va. 335, 32 S.E.2d 742 (1944); see 2 Restatement (Second) of Torts § 500-03 (1965). While wilful, wanton, and reckless misconduct are well-established concepts, we wish to make clear that we are using the words "wilful," "wanton," and "reckless" misconduct synonymously, and that the conduct removing the immunity bar must be undertaken with a knowledge and an appreciation of the high degree of risk of physical harm to another created thereby. See Restatement (Second) of Torts § 500, Comment a at 587-88 (1965).[10]
Although liability is not simply a function of the degree of the risk created by the conduct without regard to the social utility of such conduct, the degree of the risk of physical harm necessary for a finding of reckless misconduct is greater then that which is necessary to make the conduct negligent. Liability will require "a strong probability that harm may result." Restatement (Second) of Torts § 500, Comment f. at 590 (1965).

II
Having defined "deliberate intention" within the meaning of the Workmen's Compensation Act, we now consider the instant cases against that substantive law background. In Mandolidis and Snodgrass the plaintiffs' appeal from trial court orders granting summary judgments for the respective defendants. The single issue for decision in both cases is, of course, whether the trial courts were correct in granting the summary judgments. These cases will be discussed first.
On April 5, 1974, plaintiff Mandolidis was employed as a machine operator in the furniture manufacturing business of Elkins Industries, Inc. While operating a 10-inch table saw not equipped with a safety guard, his right hand came in contact with the saw blade resulting in the loss of two fingers and part of the hand itself.
On April 1, 1976, Mandolidis filed a complaint against Elkins Industries, Inc., in the Circuit Court of Randolph County, alleging *915 that the table saw he was operating when he was injured was not equipped with a safety guard, although it was well known by the defendant that in the defendant's industry that this constituted a violation of federal and state safety laws and accepted industry standards; that the defendant had actual knowledge of the consequences of running such machinery without safety guards, because employees other than the plaintiff had previously suffered injuries as a result of the lack of such guards; that the plaintiff objected to operating the saw without a guard and was told by the defendant, through its agent, to operate the machine or be fired from his job; that this order was issued by the defendant in wilful, wanton, malicious, and deliberate disregard for the well-being of the plaintiff with a deliberate intention to injure or kill him; that a short period of time before plaintiff's injury, federal inspectors had cited the defendant for violations of the Occupational Health and Safety Act because the table saw involved did not have a guard; that the inspectors put tags on the machine forbidding its use until equipped with a guard; that defendant installed a guard of the incorrect type and then shortly thereafter ordered it removed in wilful, malicious, and deliberate disregard of federal and state safety laws; that the defendant fired an employee who refused to operate the saw without a guard; that the defendant ordered employees to operate machines without guards in order to improve production speed and thus increase profits in utter and malicious disregard of the well-being of the plaintiff; that the aforesaid actions and inactions were taken by defendant with the deliberate intention to kill or injure plaintiff, and that the defendant had actual notice and knowledge of the dangerous condition of the unguarded saw and the injuries of other employees caused by that condition; that defendant wholly, wilfully, wrongfully, deliberately, maliciously and with intent to injure or kill plaintiff refused to provide plaintiff with reasonably safe equipment and a reasonably safe place to work; and that the conduct of the defendant was such as to constitute a wanton, wilful, and malicious disregard of the life and limb of its employees so as to warrant a specific finding of a deliberate intent to inflict bodily harm or injury upon its employees in general and the plaintiff in particular.
The defendant filed a motion to dismiss under R.C.P. 12(b) accompanied by affidavits denying any deliberate intent to injure the plaintiff, and contending that a subscriber to the Workmen's Compensation Fund it was immune from a common law damage action. An affidavit by the President and General Manager of the defendant corporation stated that defendant was a subscriber to the Workmen's Compensation Fund, and denied both the allegation that the defendant deliberately intended to injure the plaintiff and the allegation that he, or anyone at his direction or in his presence, ever threatened or intimidated the plaintiff concerning the operation of his machine. In a second affidavit, defendant's foreman admitted there was no safety guard on the table saw at the time of plaintiff's injury but expressly denied that he or anyone in his presence had ever ordered the plaintiff to remove the safety guard, or to operate the saw without a safety guard. Similarly, he denied knowledge of the plaintiff being threatened with the loss of his job unless he operated the unguarded saw. The foreman's affidavit also asserted that just prior to the occurrence in question he had been assisting the plaintiff by acting as an "off bearer"; that he had to leave for a few minutes so he expressly instructed the plaintiff not to continue to operate the saw alone; and that plaintiff did operate the saw alone resulting in the injury complained of to his hand.
Plaintiff deposed seven former employees of Elkins Industries. Five of these employees, including the President and the steward of a union which once represented employees of Elkins Industries, Inc., indicated that they had complained on numerous occasions *916 to the plant foreman and the plant manager regarding the lack of guards on the table saws. The steward indicated that on one occasion when he complained about the lack of saw guards, the plant foreman just "hee hawed around about it." The former union president indicated that she informed the plant manager that the absence of saw guards was a violation of law, but he "just shrugged his shoulders." Three former employees indicated they had seen the plant foreman remove the guards from the saws. The former plant safety inspector indicated that he had shut down and placed an out-of-order sign on a guardless saw, but the foreman "tore off" the sign and placed the saw back in operation. Three of the former employees indicated that they had been told by the foreman that the guards slowed down production. In his deposition, the plaintiff contradicted the foreman's claim that he told the plaintiff not to continue to operate the saw alone. The plaintiff's version was corroborated by the deposition of another employee working near the plaintiff when the injury occurred.
Four of the former employees, including the plaintiff, indicated that the foreman's instructions via the plant manager were that anyone refusing to run a saw without a guard would be "sent home" or fired. One former employee indicated that he had been fired for refusing to run a saw without a guard. These assertions expressly contradicted the affidavits of the foreman and plant manager. Plaintiff's deposition expressly contradicted the assertion contained in the plant manager's affidavit that the allegation of deliberate intent in the plaintiff's complaint was made only to circumvent the immunity bar. The former union president indicated that she informed the plant manager that the plaintiff had been injured on a guardless saw and his reply was, "So what?" "He's getting compensation."
On August 17, 1976, the trial court, upon consideration of all matters presented to it, determined that "a deliberate intent to injure plaintiff was lacking," sustained the defendant's motion to dismiss, and dismissed the action with prejudice.
The Snodgrass case arises as a result of events that occurred on May 17, 1974. At that time one of the defendants, United States Steel Corporation, was engaged in the construction of a bridge across the New River Gorge in Fayette County, and the plaintiffs, Carl Ray Snodgrass, James H. Taylor, Owen Facemire, Jr. and Gerald L. King, and the plaintiff Joanne Snodgrass' decedent Daniel C. Snodgrass, were employees of the defendant, United States Steel Corporation and were engaged in work in connection with the aforementioned bridge construction. The allegations of plaintiffs' complaint filed in the Circuit Court of Fayette County describe the events of that day in the following manner: The plaintiffs and plaintiff's decedent were working on a platform located adjacent to the construction at the northern bridge abutment. The platform was made of rough lumber and was approximately 6 feet wide, 30 feet long and 14 inches thick. One end of the platform rested on the northern rim of the gorge near the abutment, while the southern end rested on steel reinforcing rods extending from a concrete bridge pier. The platform spanned an excavation, of a depth of approximately 25 feet. The platform became dislodged when a large wire cable was dragged across it and the platform and the men working on it fell into the excavation, causing serious and permanent injury to some of the plaintiffs and death to one of the plaintiff's decedent. Plaintiffs allege that the injuries and death were proximately caused by the negligent and wilful acts of the defendant, more particularly, the failure to provide a safe place to work, the failure to advise or warn the plaintiffs of the impending danger, the failure to equip the plaintiffs with proper tools and equipment, the failure to adopt reasonable safety standards, the failure to provide adequate safety precautions, the failure to follow reasonable safety standards, the violation of the employees collective bargaining agreement *917 regarding safety rules, and the violation of the laws of the State of West Virginia and of the United States of America. Plaintiffs contend that these acts and omissions were such that they constituted a wilful and intentional injury.
The defendant filed a motion to dismiss asserting, inter alia, the immunity from common law damage actions provided by the workmen's compensation statute. The motion was accompanied by two affidavits. The first affidavit by the Workmen's Compensation Commissioner indicated that defendant was a self-insurer within the meaning of the workmen's compensation statutes; that defendant had provided its own system of compensation and was not in default under the law; and that plaintiffs had accepted benefits under the Act for the injuries that occurred on May 17, 1974. The second affidavit by the defendant's project superintendent merely stated the conclusion that the injuries and death complained of were the result of an unforeseen accident and did not result from the deliberate intention of the defendant. The affidavit contains no facts regarding the conditions existing at the time of the incident, nor does it contain facts regarding the occurrence.
Plaintiffs filed an affidavit by plaintiff Owen Facemire which, among other things, asserted that the defendant's actions in violating statutes, rules, regulations, and contractual provisions were deliberate and intentional. The affidavit also described the construction of the work platform and claimed that the use thereof was a deliberate violation of occupational safety and health standards, the construction, safety and health regulations of the Department of Labor, and the West Virginia Safety Code for building construction of the West Virginia Department of Labor. Additionally, the affidavit described in detail the manner in which the event occurred.
On March 21, 1977, the trial court granted United States Steel's motion to dismiss upon consideration of all the matters presented by the parties, and dismissed plaintiffs' action with prejudice.
Notwithstanding the style of defendant's motions to dismiss and the wording of the dismissal orders in Mandolidis and Snodgrass, the trial courts' consideration of affidavits and depositions converted the motions to dismiss to motions for summary judgment under Rule 56. Wilfong v. Wilfong, 156 W.Va. 754, 197 S.E.2d 96 (1973). Accordingly, the sole issue in both cases is whether the trial courts erred in concluding there was no genuine issue of material fact and the defendants were entitled to judgment as a matter of law.

III
Rule 56(c) provides the standard for determining whether a summary judgment in a given situation should be granted. It states in relevant part that "the judgment shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
In making the determination of whether a motion for summary judgment was properly granted, it is essential that each case be considered on its own peculiar facts and circumstances. Howard's Mobile Homes, Inc. v. Patton, 156 W.Va. 543, 195 S.E.2d 156 (1973).
It is basic summary judgment law that "`a party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." Johnson v. Junior Pocahontas Coal Co., W.Va., 234 S.E.2d 309, 315 (1977), quoting, syllabus point 6 of Aetna Casualty & Surety Company v. Federal Insurance Co., 148 W.Va. 160, 133 S.E.2d 770 (1963). And this Court held in Oakes v. Monongahela Power Co., W.Va., 207 S.E.2d 191, 194 (1974) that "although summary judgment ... is *918 a device designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial, Hanks v. Beckley Newspapers Corp., 153 W.Va. 834, 172 S.E.2d 816 (1970), such judgment should be granted only when it is clear that there is no genuine issue of fact to be tried. As succinctly stated in Haga v. King Coal Chevrolet Co., 151 W.Va. 125, 150 S.E.2d 599 (1966) `If a genuine issue as to any material fact is raised in any action, a summary judgment under the provisions of Rule 56... can not be granted.'" See also Aetna Casualty and Surety Co., supra.
The record in Mandolidis discloses that there were material facts in issue. Was the plaintiff told by a company agent that he would be discharged if he refused to run an unguarded saw? Did the foreman tell the plaintiff to wait until his return before continuing to run the saw? The circuit court's order unfortunately does not contain findings of fact or conclusions of law, but it is clear from the record that there were facts in issue. Accordingly, implicit in the court's ruling is the judgment that there were no material facts in issue. This Court cannot agree. The plaintiff is entitled to prove these facts in support of his case, because these facts render the desired inference, when taken together with other facts the plaintiff clearly intends to prove, i. e., that the defendant acted with deliberate intent, more probable than it would be without those facts.
We are of the view that complicated industrial "accidents," wherein the state of mind of company representatives is critical, seldom lend themselves to disposition by summary judgment, and where there is any doubt such a motion should be refused. Conclusory affidavits simply denying the existence of the requisite intent, obviously make no contribution to the factual development of the litigated event and, therefore, provide no assistance to the trial court in determining whether a genuine issue of material fact exists. It is for this reason that Rule 56(e) provides that affidavits "shall set forth such facts as would be admissible in evidence."
The trial court in Mandolidis "determine[d] that the deliberate intent to injure... is lacking." The Court thus found that even if all plaintiff's facts were taken as true plaintiff could not as a matter of law meet the evidentiary burden of proof with regard to a necessary element of his cause of action. The court determined that even if all of plaintiff's facts were taken as true, they would not support an inference that the defendant employer acted with "deliberate intent." In other words, reasonable men could not infer from all those facts the necessary intent. We do not believe that reasonable men could not infer the necessary intent from the facts in Mandolidis. Accordingly, the court's determination of this issue was erroneous. For these reasons the court's final order in Mandolidis was in error.

IV
Applying the law to the record in Snodgrass leads to the ineluctable conclusion that the court acted improperly in granting the defendant's motion for summary judgment. Based upon our view of the record, we draw the following conclusions with regard to the existence of an issue as to a material fact. The plaintiff's complaint alleges the violation of numerous safety laws, rules, and regulations. The complaint contains factual allegations regarding the improper construction of the platform and describes the circumstances surrounding the actual fall of the platform. Plaintiff's affidavit contains details as to the violation by the defendant of numerous laws, rules and regulations. The affidavit contains facts concerning the construction of the platform and describes the fall of the platform. The defendant chose not to file an answer relying upon a motion to dismiss, thus the allegations of the plaintiff's complaint remained undenied.
*919 The defendant, in support of the motion, filed two affidavits. The affidavit of John Kelly, project superintendent for the defendant, contains no facts with regard to the conditions existing at the time of the accident nor does it contain facts regarding the actual occurrence in question. The affidavit states the bare legal conclusion that the injuries and death in question were the result of an unforeseen accident and did not result from the deliberate intention of the defendant to produce such injury or death. The statement is a conclusion as to the ultimate fact in issue; its admissability at trial would be questionable. See Rule 56(e).
Save this one conclusion as to the ultimate fact, the record contains no facts supporting defendant's motion. This record leads to the conclusion that the principles set forth in this opinion were not followed by the trial court in sustaining the defendant's motion. The facts alleged in plaintiff's complaint and the facts set forth in plaintiff's affidavit were material since their existence or nonexistence might affect the result of the action.
The trial court's memorandum letter of March 4, 1971, indicates that it found that even if all the plaintiff's facts were regarded as true, reasonable men could not infer therefrom the necessary intent. In pertinent part it reads:
The file establishes that this defendant had the protection of the subscriber to the W. Va. Workmen's Compensation law and that the plaintiffs had received compensation benefits. The plaintiffs accordingly, would have no right of action against the defendant employer unless it could be established that the death and the injuries complained of were intentionally inflicted upon the employees involved. The specific allegations of the complaint and the affidavit of Mr. Facemire failed even to come close to establishing that the accident which is the basis of this action and the consequent injury to the employees were intentionally caused or inflicted by the employer.
The affidavit of Mr. Facemire asserts that the scaffold on which they were working was not properly constructed and may not have had sufficient safety features to begin with, but he states that the scaffold was caused to fall by a crane operator dragging a 45 ton wire cable across the end of it without the knowledge that the plaintiffs were on or near the scaffold. Certainly this does not establish intentional injury. (emphasis supplied)
On this record we cannot conclude that reasonable men could not draw varying inferences from the facts of record and that reasonable men could not infer that the injuries and death complained of resulted from a deliberate intent to produce such an injury or death within the contemplation of the workmen's compensation statute. For the above-stated reasons, we conclude from an examination of the entire record, the proof presented a genuine issue as to whether the plaintiff was injured as a result of a deliberate intent and that the trial court's ruling sustaining the defendant's motion for summary judgment was in error.

V
In Dishmon, the final case, the Circuit Court of Boone County, by order entered September 27, 1976, sustained a motion to dismiss on behalf of the defendant, Eastern Associated Coal Company.
The record reveals that on June 5, 1975, at about 10:30 P.M., Lloyd E. Dishmon reported for work at the Eastern Associated Coal Company, Harris No. 2 Mine, at Bald Knob in Boone County. Shortly thereafter, a large quantity of slate fell from the roof of his work area crushing him to death. On June 15, 1976, plaintiff Mary Kay Dishmon, Administratrix of the Estate of Lloyd E. Dishmon, filed a complaint against decedent's employer, Eastern Associated Coal Corporation alleging, among other things, that at all relevant times the defendant was subject to the provisions of 30 U.S.C. § 862 *920 and 30 U.S.C. § 873(a) relating to roof supports, blasting and explosives; was subject to the regulations of the Secretary of the Interior relating to roof supports and blasting; and was subject to the provisions of W.Va. Code § 22-2-26, 27, 29 and 32 relating to roof space, rib supports, explosives and blasting.
Plaintiff further alleges that the defendant deliberately, intentionally, wilfully and wantonly allowed employees, including plaintiff's decedent, to work in conditions which were in violation of the aforementioned laws, rules and regulations, and that the proximate result of such deliberate, intentional wilful and wanton misconduct was the death of plaintiff's decedent.
The defendant employer did not answer but filed a motion to dismiss asserting that the complaint should be dismissed on the basis of the employer's immunity secured by W.Va. Code § 23-2-6, and further that the complaint failed to allege that the defendant deliberately and intentionally killed plaintiff's decedent as required by W.Va. Code § 23-4-1. The court sustained the defendant's motion to dismiss.
The purpose of a motion under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure is to test the formal sufficiency of the complaint. For purposes of the motion to dismiss, the complaint is construed in the light most favorable to plaintiff, and its allegations are to be taken as true. Since common law demurrers have been abolished, pleadings are now liberally construed so as to do substantial justice. W.Va. R.C.P. 8(f). The policy of the rule is thus to decide cases upon their merits, and if the complaint states a claim upon which relief can be granted under any legal theory, a motion under Rule 12(b)(6) must be denied. United States Fidelity & Guaranty Co. v. Eades, 150 W.Va. 238, 144 S.E.2d 703 (1965). "The trial court's inquiry [is] directed to whether the allegations constitute a statement of a claim under Rule 8(a)." Chapman v. Kane Transfer Co., W.Va., 236 S.E.2d 207, 212 (1977). W.Va. R.C.P. 8(a) reads as follows:
(a) A pleading which sets forth a claim for relief . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief ....
In a recent case we tried to assist the lower courts in ruling on 12(b)(6) motions by adopting the standard promulgated by the United States Supreme Court for the identical Federal Rule 12(b)(6). The third syllabus point of Chapman v. Kane Transfer Co., supra at 208 sets out the standard:
3. The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
All that the pleader is required to do is to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist. The trial court should not dismiss a complaint merely because it doubts that the plaintiff will prevail in the action, and whether the plaintiff can prevail is a matter properly determined on the basis of proof and not merely on the pleadings. Wright & Miller, Federal Practice and Procedure : Civil § 1216 (1969).
In view of the liberal policy of the rules of pleading with regard to the construction of plaintiff's complaint, and in view of the policy of the rules favoring the determination of actions on the merits, the motion to dismiss for failure to state a claim should be viewed with disfavor and rarely granted. The standard which plaintiff must meet to overcome a Rule 12(b)(6) motion is a liberal standard, and few complaints fail to meet it. The plaintiff's burden in resisting a motion to dismiss is a relatively light one. Williams v. Wheeling Steel Corp., 266 F.Supp. 651 (N.D.W.Va. 1967).
*921 We believe the complaint, when considered in the light most favorable to the plaintiff, with its allegations taken as true, states a claim for relief. Regardless of how difficult the proof may be when it comes to trial, the plaintiff should have the benefit of discovery. If all the plaintiff's allegations are taken as true, we cannot say that reasonable men could not infer therefrom the intent necessary to overcome defendant's immunity. We believe the judgment of the trial court was in error. Whether such an inference standing alone could support a verdict in plaintiff's favor is a matter for determination at a later time. For these reasons, we feel that the court erred in sustaining the defendant's motion to dismiss.
Accordingly, we hereby reverse and remand all three cases to the respective circuit courts for further proceedings consistent with this opinion.
Reversed and remanded.
NEELY, Justice, dissenting:
This dissent may be unique in the annals of dissenting opinions in this State in that I dissent to the tone of the majority opinion rather than to its holding. A fair reading of the majority opinion implies to me that this Court has been waiting many years to remove the yoke of oppression from the workers of this State by providing a vehicle for recovery of common law jury awards for negligently inflicted, work-related injuries in addition to the admittedly parsimonious awards of Workmen's Compensation. Furthermore, the majority opinion fairly implies that we are awaiting an opportunity to create a new legal fiction worthy of the common law fine and recovery of the ancient Britons[1] to be known as "constructive intent to injure" by which we shall magnanimously supplement compensation awards in every routine industrial accident.
Our law has long recognized that injuries arising from the deliberate intention of the employer to injure are outside the immunity provision of the workmen's compensation law. W.Va.Code, 23-4-2 [1969]. Brewer v. Appalachian Constructors, Inc., 135 W.Va. 739, 65 S.E.2d 87 (1951); Allen v. Raleigh-Wyoming Mining Co., 117 W.Va. 631, 186 S.E. 612 (1936). See also, Eisnaugle v. Booth, W.Va., 226 S.E.2d 259 (1976). It appears to me that where my more moderate views are impaled in these consolidated cases is pure procedure, i. e., in the interrelationship between the practice of notice *922 pleading and the necessity to eliminate all conceivable factual disputes before summary judgment can properly be awarded.
I cannot cavil with the majority's reversal based on procedure. Notice pleading, pursuant to W.Va.R.C.P. 8(a), and summary judgment practice, pursuant to R.C.P. 56(c) prevent a judge from "sniffing out" a totally meritless case and summarily dismissing it. I cannot disagree with the majority opinion that in all three cases the petitioners Alleged sufficient matter to be allowed an opportunity to develop facts.
Nonetheless, I have some educated feelings for the facts in each of these three cases and it appears to me that only in the Mandolidis case has the plaintiff any legitimate grounds for recovery. In that case not only was a safety statute violated, but, in addition, the particular safety hazard at issue, a dangerous saw, was brought to the attention of the management by a safety inspector who closed down operation of the saw; management disregarded the safety shut down; and, management ordered the injured workman to operate the dangerous saw implying by past actions that to do otherwise would cost him his job. These facts, if proven, demonstrate more than even gross negligence; they demonstrate a willful, wanton, and reckless disregard for human safety.
I doubt that the plaintiffs in Snodgrass or Dishmon can develop anything other than gross negligence, and I would hasten to point out that gross negligence is not the same thing as either intent to injure or willful, wanton, and reckless disregard for human safety. In order for a workman to recover under the intentional injury exception to workmen's compensation immunity, W.Va.Code, 23-4-2 [1969], the standard of proof should be at least as high as that required to prove malice in a murder case. If an act involves such a wanton and willful disregard of an unreasonable human risk as to constitute malice then no actual intent to kill or injure is necessary.[2]
This is not the same standard used for criminal negligence. A motorist might pass another car or speed in a manner which, if he causes the death of another, would make him guilty of manslaughter. Another man, without any specific intent to kill anyone, might walk onto his porch and open fire with a machine gun which, if he causes the death of another, would make him guilty of murder. What makes the motorist guilty of manslaughter and the shooter guilty of murder is the shooter's cruel and wicked indifference to human life. The key is that the act of the shooter shows a viciousness not found in the motorist.[3] The motorist is violating a positive law mandate while the shooter is violating a natural law mandate.
Accordingly, what concerns me in the tone of the majority opinion is its inspiration to the bar to do a substantial disservice to the economy of this State by instituting frivolous suits every time a workman is injured by anything other than his own negligence. Violation of a safety statute alone does not constitute intentional injury, Evans v. Allentown Portland Cement Co., 433 Pa. 595, 252 A.2d 646 (1969); unsafe working conditions do not constitute intentional injury. Southern Wire & Iron Co. v. *923 Fowler, 217 Ga. 727, 124 S.E.2d 738 (1962); failure to follow recommended procedures or to take standard precautions do not constitute intentional injury. All people, both employers and workmen, are negligent much of the time, and the theory of the Workmen's Compensation Act is to compensate work-connected injury as a normal cost of doing business. What was merely common sense in days of yesteryear has today been codified into elaborately detailed safety codes, so that to say that a safety statute was violated is only to say that an employer has failed to use reasonable care. Violation of a positive law mandate does not elevate negligence to intent to injure no matter how gross the negligence; only violation of a natural law mandate, i. e., an evil blackness of heart and callous indifference to the suffering of others, would so elevate it. While we may be outraged by the parsimony of the statutory compensation awards, we cannot be outraged at the theory of the compensation scheme, which while denying a claimant the advantage of a common law judgment when the employer is at fault, still has the employer pay even when the claimant is at fault.
Often it is procedure itself which distorts the entire process; the tone of the majority opinion invites nuisance law suits, a high percentage of which will be settled (particularly by small employers) in preference to sustaining the costs of litigation. The risk, not necessarily the eventuality, of an enormous common law jury award in the event of a capricious judicial process (i. e., an unusually plaintiff oriented trial judge combined with faulty appellate review) are such that some settlements not contemplated by the statutory scheme will inevitably be forthcoming. Settlements are based on the if's, maybe's and might's of the judicial process, and not upon the inevitability of a result in consonance with the ideal administration of the law. The settlements I hypothesize combined over the course of a year, plus the attendant costs of defending frivolous law suits, are the type of expenses which not only divert needed resources from the fund available for wages, plant modernization, and stockholders' dividends, but contribute to inflation by increasing costs and prices in the oligopolistic sector of the economy, and reducing production in the market sector of the economy where companies unable to pass along these costs collapse.
Obviously, I am not alleging that by being reactionary about the administration of our workmen's compensation laws we can cure the economic ills of mankind everywhere; I am merely pointing out that numerous untoward consequences can arise from lack of attention to the distortive effects of the legal process itself, and thus tone in judicial opinions becomes important.
Without amending the Rules of Civil Procedure or completely reversing this Court's direction on the law of summary judgment, it would be difficult to encourage trial judges to dismiss frivolous law suits on the bare pleadings without an opportunity to develop the facts. Nonetheless, the law appears clear that the trial courts would be remiss in their duty if they permitted more than one case alleging intentional injury in a hundred to go to the jury. With regard to cases involving nothing but gross negligence on the part of the employer, the plaintiff should be given an opportunity to develop his case on depositions, and then the trial court should grant summary judgment. If neither plaintiff nor defendant wishes to engage in extensive pre-trial discovery, then at the trial stage, notwithstanding the impaneling of a jury, the trial judge should dismiss the plaintiff's case at the close of plaintiff's evidence without the least hesitation unless facts have been clearly proven demonstrating deliberate intention to injure or kill or a reckless, wanton, and willful disregard of human life. This is one area of the law in which the threshold issue concerning statutory immunity is in no regard a "jury question." Minute supervision by the trial judge is mandated in all cases because the exception to the blanket workmen's compensation immunity *924 which would permit a plaintiff to submit his case to a jury is so narrow, and the construction of what does or does not constitute a case within the exception is so technical, that trial judges should ruthlessly decide the issue as a matter of law in the first instance.
I recognize that the tone of the majority opinion faithfully represents the judicial philosophy of the majority writer, but it implies an attitude on the part of this Court which is contrary to both the legislative intent and this Court's faithful interpretation of that intent over the years. The tone is wrong for what it implies; the holding is entirely correct with regard to Mandolidis, but correct only in the most narrow procedural way with regard to Snodgrass and Dishmon.
MILLER, Justice, concurring:
I concur in the majority opinion as I do not believe it represents a departure from this Court's construction of the deliberate intent exception[1] to the immunity from suits for damages extended to employers who subscribe to the Workmen's Compensation Fund.[2]
The differences between our first case, Collins v. Dravo Contracting Co., 114 W.Va. 229, 171 S.E. 757 (1933), and the last, Eisnaugle v. Booth, W.Va., 226 S.E.2d 259 (1976), are at best semantical. Both Allen v. Raleigh-Wyoming Mining Co., 117 W.Va. 631, 186 S.E. 612 (1936), and Brewer v. Appalachian Constructors, Inc., 135 W.Va. 739, 65 S.E.2d 87 (1951), share a common bond with Maynard v. Island Creek Coal Co., 115 W.Va. 249, 175 S.E. 70 (1934), in that they utilize this key passage from Maynard:
"It may be that the carelessness, indifference and negligence of any employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury." [115 W.Va. at 253, 175 S.E. at 72]
Maynard also spoke of the exemption from liability to employees for injuries received resulting from their employment, "except, if such injuries be willfully inflicted by the employer." [115 W.Va. at 252, 175 S.E. at 71] [emphasis added]
The divergent language in our cases arises from the struggle to place the term "deliberate intention" into an existing legal compartment. Judge Kenna identified this problem in Collins, stating:
"There are definitions of intent in the books more variant than the manifold uses to which that word is put. They range from the statement that a man is presumed to intend the ordinary and usual consequences of his acts, to definitions which make intent practically depend upon the existence of actual malice. In its nature, it is bound to be the existence of a state of mind, and since that state of mind must be arrived at in proof by the establishment of facts extraneous to the mind itself, it seems to us that it is always bound to be a deduction or conclusion from the facts so established. In the *925 very nature of things, these facts, in the main, are matters of evidence and not of pleading." [114 W.Va. at 235,171 S.E. at 759]
Generally, the law recognizes that intention[3] can be ascertained either from verbal or nonverbal conduct of a party. The simplest proof is where the actor admits he consciously intended his conduct to produce the result it did.
The more usual situation is where intention must be inferred from a person's conduct.[4] Here, the inquiry is directed at the degree of probability that the conduct will produce a given result. The higher degree of probability that a given result will follow, the greater the intention is inferred from the conduct.
The link between the conduct and the resulting harm is not only a causative inquiry, but includes another factor by which the conduct is judgedthe degree of seriousness of harm. Conduct which carries a high probability that serious harm will result is high on the scale of intentional conduct. Finally, the standard by which the conduct and its resulting harm is judged to determine its "intentional" characteristics is not only the subjective knowledge of the individual, but what would be known by a reasonable person.[5]
It is apparent that because intent is measured by the degree of harm occasioned by given conduct, the law labels both the conduct and the intent. Thus we speak of negligent conduct, meaning it is at the bottom of the intent scale, which is to say conduct that is not intentional. At the far end of the scale is the type of intent necessary for first degree murder, which is beyond the concept of malice and involves deliberation and premeditationthe specific intent to kill. State v. Starkey, W.Va., 244 S.E.2d 219 (1978); State v. Stevenson, 147 W.Va. 211, 127 S.E.2d 638 (1962).[6]
*926 The problem, of course, is an ancient one. It is the attempt to label or categorize certain acts in order to fit them into our precedential system of law. Admittedly, there is an almost infinite number of variations of conduct such that any process of labeling or categorizing can be criticized as imprecise. Yet, the law requires the effort of systematization to be done, or runs the risk of deciding cases not precedentially, but purely on an ad hoc basis.
It seems to me that a fair reading of our prior cases in this area demonstrates that it was never contemplated that the term "deliberate intention" referred only to the type of intent necessary to support a charge of first or second degree murder. If such were the case, there would have been no justification in Allen and Brewer, which were the first cases to use the term "specific intent," to quote the Maynard statement of a wanton injury. Moreover, Maynard's use of the term "willfully inflicted" as being sufficient to hold the employer liable for an injury has never been criticized.
Certainly all of our cases in this field have held that gross negligence is not equivalent with deliberate intent. To my mind the key language in the majority opinion is:
"We wish to make clear that we are using the words `wilful,' `wanton,' and `reckless misconduct' synonymously, and that the conduct removing the immunity bar must be undertaken with a knowledge and an appreciation of the high degree of risk of physical harm to another created thereby." [246 S.E.2d at p. 914]
I believe this rule is perfectly consistent with our former cases and, if applied, would not have changed the result in any of them. This rule, as I understand it, builds on the standard for wilfulness or wantonness in Stone v. Rudolph, 127 W.Va. 335, 32 S.E.2d 742 (1944), which "... imports premeditation or knowledge and consciousness that injury is likely to result ..." [127 W.Va. at 346, 32 S.E.2d at 748] by adding the concept that there is knowledge the conduct carries a "high degree of risk of physical harm." This is no insubstantial hurdle of proof.
In view of the tone of the dissent,[7] I am constrained to state that I believe his theoretical fears of increased nuisance suits are not well-founded. It is an argument customarily advanced by those who have had little actual trial experience.
No capable trial lawyer can survive by filing nuisance suits, as the contingent fee contract rewards only those who can persevere to a decent monetary recovery. The type of case here involved is complex and depends not on a mere showing that certain safety regulations have been violated, but proof that the employer consciously sanctioned repetitive violations, knowing he had thereby exposed his employee to a high risk of physical harm, which risk did in fact cause the injury.
Because this type of case is often complex and since it requires proof of intent, from a procedural standpoint early disposition by a motion to dismiss or motion for summary judgment based on conclusionary affidavits is not warranted. The rule is stated in 10 Wright & Miller, Federal Practice and Procedure: Civil § 2730 (1973):
"Since the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial *927 evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered. But even this may not be enough. Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ a function traditionally left to the jury  summary judgment often will be an inappropriate means of resolving an issue of this character." See also Conrad v. Delta Air Lines, Inc., 494 F.2d 914 (7th Cir. 1974); Denny v. Seaboard Lacquer, Inc., 487 F.2d 485 (4th Cir. 1973); Friedman v. Meyers, 482 F.2d 435 (2nd Cir. 1973); 6 Moore's Federal Practice § 56-17 (41.-1) (2d ed. 1976); 3 Barron & Holtzoff, Federal Practice and Procedure § 1232.2 (1958).
In my view the discovery developed in Mandolidis displayed sufficient facts, as outlined in the majority opinion, to preclude the granting of a summary judgment against the plaintiff on the issue of deliberate intention. If the plaintiff can sustain the same level of proof at trial, the question of deliberate intention would be for the jury.
Both Snodgrass and Dishmon were prematurely terminated. In the former by conclusionary affidavits, and the latter based solely on the claimed inadequacy of the complaint. All we have held is that these two cases are entitled to further development through discovery before the issue of deliberate intention can be determined under the guidelines of our opinion.
NOTES
[1] W.Va.Code § 23-2-6 provides, in pertinent part, as follows:

Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter. . 1974 W.Va.Acts, ch. 145.
W.Va.Code § 23-2-6a states:
The immunity from liability set out in the preceding section [§ 23-2-6] shall extend to every officer, manager, agent, representative or employee of such employer when he is acting in furtherance of the employer's business and does not inflict an injury with deliberate intention. 1949 W.Va.Acts, ch. 136.
[2] W.Va.Code § 23-4-2 reads, in relevant part:

If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall also have cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter. 1913 W.Va.Acts, ch. 10 § 28.
[3] See generally, 1 A. Larson's, Workmen's Compensation Law ch. 1-4 (1978); W. Prosser, The Law of Torts § 80 (4th ed. 1971). This excerpt from former Governor Henry Drury Hatfield's speech to the Legislature indicates West Virginia's experience with industrial accidents was not unlike experienced elsewhere in the county:

In harmony with the advance of civilization and our duty to our neighbor, a more humane system has grown up in the way of compensating workmen who are injured while engaged in the course of their employment. The burden in the past fell upon the employee first, but in case of death, to those dependent upon him. As the law stood previous to the passage of the Workmen's Compensation law, the industry was indemnified by the insurance companies, and less than fifteen per cent of the injured received any damages in case of litigation, and then, after a long-drawn-out litigation, which resulted in practically nothing for the plaintiff. The injustice to the employee and waste of time and money to the tax-payer has excited the attention of public spirited men, and it has been demonstrated that it would have been a saving of money for the tax-payer if a reasonable compensation had been paid out of the State treasury, thereby preventing court cost and injustice. There is, however, no good reason why such a procedure should be necessary in the face of other remedies, which in justice and good conscience should be willing to do their part. Journal of the Senate, App. A, p. 67 (1915).
[4] See generally, Journal of the Senate, p. 103 06 (1913) containing former Governor Hatfield's address to the Legislature advocating passage of a compensation law to deal with accidents in modern industrial conditions.
[5] This excerpt from Dravo is particularly significant:

We cannot see why the master cannot omit to perform a certain duty imposed by law upon him with the deliberate intent by so doing to inflict injury or death upon his employee ... If the defendant permitted the conditions set forth in the declaration to exist; if they were conditions that would naturally result in injury or death to its employees, and lent themselves to that purpose; if the defendant, prior to the happening that resulted in the death of plaintiff's decedent, knew full well that such conditions existed; then, however difficult the proof may be when it comes to that, as a matter of pleading, we cannot see why the very conditions alleged as matters of fact might not have been permitted to continue with the deliberate intent on the part of the employer, and with a design, that their continuance should cause injury or death or both to its employees. Id. at 234-35, 171 S.E. at 759.
[6] See 72 W.Va.L.Rev. 90 (1970).
[7] 114-C Supreme Court Records and Briefs, Brief for the Defendant in Error, pp. 17-18.
[8] "[I]t is almost universally conceded that a corporation may be criminally liable for actions or omissions of its agents in its behalf." W. LaFave and A. Scott, Handbook on Criminal Law 229 (1972); see also State v. B. & O. R. R. Co., 15 W.Va. 362 (1879) (holding a corporation is indictable for misdemeanor of sabbath breaking); R. Perkins, Criminal Law, 641 (2nd ed. 1969). A specific or subjective intent to kill is not essential to murder in the second degree. Syl. pt. 3, State v. Morrison, 49 W.Va. 210, 38 S.E. 481 (1901); State v. Starkey, 244 S.E.2d 219 (W.Va. 1978), citing, State v. Hertzog, 55 W.Va. 74, 46 S.E. 792 (1904). Malice or the criminal intent necessary for a second degree murder conviction may be inferred from the total circumstances surrounding the act or omission. State v. Young, 50 W.Va. 96, 40 S.E. 334 (1901); State v. Douglass, 28 W.Va. 297 (1886); see W. LaFave and A. Scott, op. cit. supra § 70, discussing the conflicting views and authorities as to whether depraved-heart murder requires a subjective realization of very high risk of death or serious bodily injury; see also § 78 thereof for discussion of competing authority as to whether criminal negligence or involuntary manslaughter requires a subjective realization of the high degree of risk of serious bodily injury. See also R. Perkins, op. cit. supra 760-61.
[9] We adopt the Restatement Second of Torts definition of "intent." Intentional ". denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965). See also W. Prosser, Handbook of the Law of Torts 31-2 (4th ed. 1971).
[10] Proof of the subjective realization of the risk may and must generally be proved by circumstantial evidence. For example, the defendant's knowledge of the existence and contents of federal and state safety laws and regulations is competent evidence. Prior deaths or injuries as a result of the risk would certainly be relevant.
[1] "Fine and recovery was a fictitious and prearranged suit in the form of a writ of right started by the person to whom the property was to be conveyed in fee simple. He would allege (of course falsely) that he was the owner of the property in fee simple by a title superior to the defendant's; that the defendant had no title to the land, having come into possession of it after the complainant had been wrongfully ousted therefrom by some third person named. The defendant, tenant in tail, would then appear, making no denial of the complainant's allegations, but calling upon one X, alleged to be the man who had conveyed the land to him in tail with warranty, to appear and defend the title which he had warranted. X would then appear and defend the title, but afterwards would default, and thereupon judgment would be given to the complainant that he recover the land in fee simple, and to the tenant in tail that he recover from X lands of equal value in recompense for the lands alleged to have been conveyed by X with warranty to the tenant in tail. X, the vouchee, selected to take this pretended part because judgment proof, was usually the court crier, and came to be called the common vouchee because used so frequently in this capacity. He had never any interest in the property. The judgment against him for an equal amount of land in favor of the tenant in tail and the heirs of his body was regarded as sufficient recompense for the loss of the entail by such heirs; so that the recovery suffered by the tenant' in tail was binding as against them, the complainant taking by virtue of the judgment an estate in fee simple which cut off the entail in favor of the heirs of the body of the tenant in tail, and also the reversion of the original donor, it having been judicially determined that the complainant's title in fee simple was superior to the title of the tenant and his donor. The complainant would then convey the land in fee to the tenant in tail, or convey to another at the tenant's direction, or pay the tenant the purchase-price agreed upon in case an actual sale to him was intended." 4 Thompson on Real Property § 1866, p. 486.
[2] Brewer v. State, 140 Tex.Cr.R. 9, 143 S.W.2d 599 (1940) (Intoxicated automobile owner who turned car over to intoxicated companion and watched the companion make numerous reckless moves before fatal collision is guilty of murder); People v. Gonzales, 40 III.2d 233, 239 N.E.2d 783 (1968) (Firing shotgun into group of men implies criminal malice); Commonwealth v. Malone, 354 Pa. 180, 47 A.2d 445 (1946) (Playing "Russian Poker" is reckless conduct indicating malice); People v. Jernatowski, 238 N.Y. 188, 144 N.E. 497 (1924) (Firing shots into inhabited house evidences malice).
[3] The workmen's compensation scheme is based on personal injury "by accident." Jordan v. State Workmen's Compensation Comm'r., 156 W.Va. 159, 191 S.E.2d 497 (1972); therefore, while this standard seems very strict it must be remembered that it's not the depravity of the employer's conduct that is being tested, but the narrow issue of the intentional versus the accidental quality of the precise injury.
[1] W.Va.Code, 23-2-6a:

"The immunity from liability set out in the preceding section [§ 23-2-6] shall extend to every officer, manager, agent, representative or employee of such employer when he is acting in furtherance of the employer's business and does not inflict an injury with deliberate intention."
W.Va.Code, 23-4-2, reads in material part:
"If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall also have cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter."
[2] The applicable portion of W.Va.Code, 23-2-6, is:

"Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund ... shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing . . ."
[3] I consider the term "intention" to be substantially synonymous to "intent." The American Heritage Dictionary of the English Language 682-83 (1973), summarizes:

"Intention signifies a course of action that one proposes to follow. Intent, often a legal term, more strongly implies a fixed course pursued deliberately, ..."
[4] In criminal law where "intent" receives the greatest attention, it was not until Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), that serious examination began to be made on the validity of factual presumptions dealing with intent as they opposed the presumption of innocence. See also State v. Myers, W.Va., 245 S.E.2d 631 (1978) (No. 13896); State v. Starkey, W.Va., 244 S.E.2d 219 (1978); State ex rel. Cogar v. Kidd, W.Va., 234 S.E.2d 899 (1977); State v. Pendry, W.Va., 227 S.E.2d 210 (1976); Pinkerton v. Farr, W.Va., 220 S.E.2d 682 (1975).
[5] Justice Holmes discusses the question of intent in both the criminal and intentional tort fields in O. W. Holmes, The Common Law (1881). He traces the historical precedents and arrives at a parallel conclusion: "The test of criminality in such cases is the degree of danger shown by experience to attend the act under the circumstances," Id. at 75, and as to intentional wrongs: "In general this question will be determined by considering the degree of danger attending the act or conduct under the known circumstances." Id. at 162. W. LaFave & A. Scott, Criminal Law §§ 28, 30 (1972), extensively discuss the concept of intent from a criminal and civil standpoint. In summarizing as to the former, they state: "Intent has traditionally been defined to include knowledge, and thus it is usually said that one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." Id. at 195-96. In settling the concept of "recklessness" they state: "Something more is usually required for criminal liability, either (1) a greater risk of harm, (2) subjective awareness of the risk by the defendant, or (3) both. The word `recklessness' is most often used to describe the third situation,..." Id. at 208.
[6] W. Prosser, Torts 184 (4th ed. 1971), discusses the differences between criminal intent and the intent necessary for an intentional tort, stating: "Lying between intent to do harm, which as we have seen includes proceeding with the knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called `quasi intent.' To this area the words `wilful,' `wanton' or `reckless' are customarily applied; and sometimes in a single sentence, all three."
[7] Despite the claimed uniqueness of the "tonal" dissent, the writer apparently has missed hearing certain atonalities to his own opinions. See, e. g., Rosier, Adm. v. Garron, Inc., 156 W.Va. 861, 199 S.E.2d 50 (1973) (Justices Berry, Caplan, Haden and Sprouse concurring); Jones v. Laird Foundation, Inc., 156 W.Va. 479, 195 S.E.2d 821 (1973) (Justices Berry, Caplan, Haden and Sprouse concurring). I do not sense that the dissent takes issue with the majority's test since he applies it to find Mandolidis as having "legitimate grounds for recovery." This conclusion is based on the dissenter's statement, "These facts, if proven, demonstrate more than even gross negligence; they demonstrate a wilful, wanton and reckless dis regard for human safety." [Dissent at 922]