512 S.E.2d 177

**STATE of West Virginia, Appellee,**

v.

**Ardyce C. BULL and Michael
P. Bull, Appellants.**

No. 25179.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 10, 1998.

Decided Dec. 4, 1998.

Darrell V. McGraw, Jr., Esq., Attorney General, Kristine M. Howard, Esq., Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

Arthur T. Ciccarello, Esq., Ciccarello, Del Giudice & LaFon, Charleston WV, Patrick A. Nichols, Esq., Parsons, West Virginia, Attorneys for Appellants.

STARCHER, Justice:

## I.

### Facts & Background[1]

In June of 1994, the appellants Michael Bull and Ardyce Bull, who were husband and wife, were living in Parsons, West Virginia. Ardyce Bull is a physician who in June of 1994 was working at Davis Memorial Hospital. It appears that the appellants had moved to Parsons from Texas in 1993.

Ardyce Bull's father, Norman Carlson, a retired steelworker, had been living either with the appellants in Texas, or with Michael Bull's mother (Eva Bull) in Pennsylvania, since shortly after Mr. Carlson's wife passed away in 1990.

In mid-June of 1994, Mr. Carlson, who at the time was 78 years old, had been staying with the appellants in Parsons for several weeks. On Thursday, June 16, or Friday, June 17, 1994, the appellants left their home in Parsons to travel to Eva Bull's home in Pennsylvania, about a 4- or 5-hour drive. The appellants left Mr. Carlson alone at the appellants' home in Parsons.

The weather over the next several days was extremely hot. On Monday, June 20, 1994, at approximately 7:00 p.m., a neighbor went to the appellants' house to give water to the appellants' dogs. The neighbor heard a cat on the screened-in back porch. Thinking that the cat also might need water, the neighbor entered the porch. There the neighbor saw Norman Carlson, sitting on a wooden-slatted lawn chair.

Mr. Carlson was dressed in a cloth robe, underwear, and leather boots with no socks. He had defecated and he was seated in his feces. He had also urinated on himself, and the urine had run down his legs and into his boots.

---

1. These factual statements are based upon evidence taken from the trial record. The appellants put on evidence that would, if believed, contradict some of these factual statements. However, in light of the jury's guilty verdict, we view factual conflicts in the evidence as having been resolved by the jury in a fashion consistent with the jury's verdict.

There were bags of garbage and trash on the porch near Mr. Carlson. There was a smelly bucket in the corner of the porch, in which Mr. Carlson had apparently urinated, with a layer of dead flies floating on the surface. Several pairs of men's underwear were also in the bucket.

There was a cushioned chair next to Mr. Carlson. When Mr. Carlson was asked why he was not seated in the more comfortable chair, Mr. Carlson replied that it was Michael Bull's chair—and that he, Mr. Carlson, was not allowed to sit in it.

The neighbor called the police. Soon two employees from Davis Memorial Hospital and a social worker arrived at the Bull residence.

A kitten was in a cage near Mr. Carlson's feet. The kitten was emaciated and there was no food or water in the cage. Mr. Carlson said that the kitten was being punished because it had bitten Michael Bull.

A physician who was a neighbor of the Bulls was called to examine Mr. Carlson. She observed him to be "pleasant, but disoriented." When asked what year it was, he replied 1985. He spoke of his late wife as if she were still alive. Mr. Carlson stated that he was not allowed in the Bulls' house because "he (Mr. Carlson) messed things up."

The physician made a preliminary diagnosis of dementia, determined that Mr. Carlson could not take care of himself, and decided to call an ambulance to take Mr. Carlson to the hospital. The physician believed that, in a medical sense, Mr. Carlson was "an incapacitated adult," because he could not care for his personal needs and lacked judgment.

Several of the persons who had come to the Bulls' house as a result of Mr. Carlson's situation looked around the house, and concluded that there was essentially no edible food in the house or on the porch. There was spoiled hamburger meat and several other unidentifiable spoiled food items in the refrigerator. There was also a box of potatoes on the floor of the kitchen and a package of unopened hamburger buns in the box.

The house was a mess, and sparsely furnished. The kitchen was in disarray. Dirty dishes and pans were piled on the counters and in the sink. There was no furniture in the front room. There were no working light bulbs in the kitchen, the dining room, or the back porch where Mr. Carlson was found.

Before the ambulance arrived, Mr. Carlson was frightened by a bolt of lightning. He arose from the chair, fell, and was unable to get up.

After the ambulance arrived and took Mr. Carlson away, a written note was left for the appellants, telling them that Mr. Carlson had been taken to the hospital. At the hospital, in an initial diagnosis, Mr. Carlson was found to be dehydrated and suffering from dementia. His body hygiene was very poor, indicating a long time since he had bathed. Insect larvae—later determined to likely be maggot larvae—were recovered from Mr. Carlson's pubic region. His toenails were ¾ to 1 inch in length and had begun to curl up under his toes. The urine that had run down his leg into his boots left his feet red, raw, irritated, and swollen. His feet emitted a strong foul smell.

It was also determined at the hospital that Mr. Carlson's dehydration was serious and had the potential of being life-threatening if it continued; he was also found to be suffering from pneumonia. There was substantial medical evidence suggesting that his dementia was of a longstanding Alzheimer's-type nature.

Mr. Carlson remained in the hospital for several weeks and was subsequently placed in a personal care home. The record suggests that there were guardianship proceedings that are not germane to the instant appeal.

Shortly after learning that her father was in the hospital, Ardyce Bull spoke with a social worker in connection with her father's hospitalization. In that conversation Ardyce Bull stated that her father's mental and physical health had been deteriorating since the death of his wife 4 years earlier, and that her father had not been left alone for much more than 48 hours in recent years.

At the appellants' trial, Norman Carlson's sister, who lived in New York State, testified that she had noticed that Mr. Carlson was

mentally confused following his wife's death in 1990. At that time he had a slow and uncertain gait. Mr. Carlson's sister said that she would not leave Mr. Carlson alone for more than a few hours at a time when he briefly stayed with her in New York. She also said that she had sent Mr. Carlson on an airplane to live with Ardyce Bull in Texas wearing a button that identified Mr. Carlson as needing assistance from airline personnel, because of his physical and mental disability.

On February 14, 1995, a Tucker County grand jury jointly indicted the appellants, charging each of them with one count of violating *W.Va.Code*, 9–6–15(b) [1984], which is quoted completely at section III, *infra*.[2]

The appellants' indictments cited this statute and further read:

> The Grand Jury Charges: That on or about the ____ day of June, 1994, in the County of Tucker, State of West Virginia, Ardyce B. Bull and Michael P. Bull committed the offense of "Neglect and abuse of an incompacitated [sic] adult" while having the actual care, custody or control of Norman Carlson, an incompacitated adult, with the intent to abuse or neglect such adult, did unlawfully, wilfully and feloniously create an emergency situation for said Norman Carlson, an incompacitated [sic] adult, against the peace and dignity of the state.

On February 9, 1996, the appellants filed a request for a Bill of Particulars, asking *inter alia* for details of the prosecution's proof regarding the allegations that the appellants acted with the intent to abuse or neglect Mr. Carlson. On March 4, 1996, 7 months prior to the appellants' October 1996 criminal trial, the prosecution filed a response to the Bill of Particulars, stating in summary what evidence the prosecution intended to offer to prove the offenses charged in the indictments.

Prior to the appellants' trial, the appellants moved the circuit court to dismiss the indictments, essentially raising the issues that are raised in this appeal. The circuit judge de-

nied the motions. After the prosecution completed its case, but before the defense put on its evidence, the prosecution elected to withdraw the claim that the appellants had an intent to "abuse" Mr. Carlson. The case thus went to the jury only on instructions related to creating an emergency situation for an incapacitated adult by means of intentional "neglect." *See* discussion at section III, *infra*.

The jury found both of the appellants guilty as charged. On September 9, 1997, Michael Bull was sentenced to 2 to 10 years' imprisonment. He made a motion for probation that was denied. On October 7, 1997, Ardyce Bull was sentenced to 2 to 10 years' imprisonment. Her sentence was suspended and she was placed on probation. The sentencing judge concluded that she had a lesser degree of culpability.

## II.

### Standard of Review

In the instant appeal, the appellants argue that the circuit court erred in not granting the appellants' motion to dismiss the indictments—on the grounds (1) that the statute upon which the indictments were founded is unconstitutionally vague; (2) that the indictments failed to charge a crime with sufficient specificity; and (3) that the indictments improperly used disjunctive language in charging the appellants.

The appellants also contend that the circuit court erred in failing to grant the appellants' motion for judgment of acquittal following the close of the evidence—on the grounds that the state had failed to prove the allegations in the indictments and the elements of the offense.

We identify the pertinent standards of review as we address these assignments of error.

## III.

### Discussion

*W.Va.Code*, 9–6–15(b) [1984], the principal statutory provision upon which the charges

---

**2.** *W.Va.Code*, 9–6–15(b) [1984], establishing the criminal offense of "abuse or neglect of incapacitated adult" was repealed in 1997. However, a similar offense was created in the provisions of *W.Va.Code*, 61–2–29 [1997]. *See* note 3 *infra*.

against the appellants were based, stated prior to its repeal, amendment, and recodification at *W.Va.Code*, 61–2–29 [1997] [3]:

> Any person having actual care, custody or control of an incapacitated adult who with the intent to abuse or neglect such adult willfully creates an emergency situation for an incapacitated adult, is guilty of a felony, and, upon conviction thereof, shall, in the discretion of the court, be confined in the penitentiary for not less than two nor more than ten years or be confined in the county jail for not more than twelve months and fined not more than fifteen hundred dollars.

*W.Va.Code*, 9–6–15(b) [1984] must be read in conjunction with the following definitional language from *W.Va.Code*, 9–6–1 [1984].

*W.Va.Code*, 9–6–1(4) [1984] defines "incapacitated adult" as:

> [A]ny person who by reason of physical, mental or other infirmity is unable to independently carry on the daily activities of life necessary to sustaining life and reasonable health.

*W.Va.Code*, 9–6–1(2) [1984] defines "abuse" as: "the infliction or threat to inflict physical pain or injury on or the imprisonment of any incapacitated adult."

*W.Va.Code*, 9–6–1(3)[1984] defines "neglect" as:

> (i) the failure to provide the necessities of life to an incapacitated adult with intent to coerce or physically harm such incapacitated adult or (ii) the unlawful expenditure or willful dissipation of the funds or other assets owned or paid to or for the benefit of an incapacitated adult[.]

Finally, *W.Va.Code*, 9–6–1(5) [1984] defines "emergency" or "emergency situation" as: "a situation or set of circumstances which presents a substantial and immediate risk of death or serious injury to an incapacitated adult."

It is the foregoing statutes that, read together, established and defined the criminal offense that the appellants were charged with committing. Therefore, it is the language in these statutes that the appellants assert to be unconstitutionally vague.

■ Claims of unconstitutional vagueness in criminal statutes are grounded in the constitutional due process clauses, *U.S. Const.* amend. XIV, Sec. 1, and *W.Va. Const.* art. III, Sec. 10. *See, e .g.,* Syllabus Point 3, *State v. DeBerry*, 185 W.Va. 512, 408 S.E.2d 91 (1991). Such claims also implicate the provisions of *W.Va. Const.* art. III, sec. 14,

---

**3.** *W.Va.Code*, 61–2–29 [1997], the current statute, states:

(a) The following words when used in this section have the meaning ascribed, unless the context clearly indicates otherwise:

(1) "Abuse" means the infliction or threat to inflict physical pain or injury on an incapacitated adult;

(2) "Care giver" means an adult who has or shares actual physical possession or care of an *incapacitated adult on a full-time or temporary* basis, regardless of whether such person has been designated as a guardian of such adult by any contract, agreement or legal proceeding. Care giver includes health care providers, family members, and any person who otherwise voluntarily accepts a supervisory role towards an incapacitated adult;

(3) "Neglect" means (i) the failure to provide the necessities of life to an incapacitated adult or (ii) the unlawful expenditure or willful dissipation of the funds or other assets owned or paid to or for the benefit of an incapacitated adult; and

(4) "Incapacitated adult" means any person who by reason of physical, mental or other infirmity is unable to physically carry on the

daily activities of life necessary to sustaining life and reasonable health.

(b) Any care giver who neglects an incapacitated adult, or who knowingly permits another person to neglect said adult, is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than five hundred dollars nor more than fifteen hundred dollars, or imprisoned in the county jail for not less than ninety days nor more than one year, or both fined and imprisoned.

(c) Any care giver who intentionally abuses or neglects an incapacitated adult is guilty of a felony and, upon conviction thereof, shall, in the discretion of the court, be confined in the penitentiary for not less than two nor more than ten years or be confined in the county jail for not more than twelve months and fined not more than fifteen hundred dollars.

(d) Nothing in this article shall be construed to mean an adult is abused or neglected for the sole reason that his or her independent decision is to rely upon treatment by spiritual means in accordance with the tenets and practices of a recognized church or religious denomination or organization in lieu of medical treatment.

that states in part: "In all such [criminal] trials, the accused shall be fully and plainly informed of the character and cause of the accusation . . . ." In *DeBerry*, we found that a statute creating the offense of felonious child neglect was not unconstitutionally vague.

■ In Syllabus Point 1 of *State ex rel. Myers v. Wood*, 154 W.Va. 431, 175 S.E.2d 637 (1970), this Court held that:

> There is no satisfactory formula to decide if a statute is so vague as to violate the due process clauses of the State and Federal Constitutions. The basic requirements are that such a statute must be couched in such language so as to notify a potential offender of a criminal provision as to what he should avoid doing in order to ascertain if he has violated the offense provided and it may be couched in general language.

Many of our cases addressing vagueness claims, including our opinion in *DeBerry*, *supra*, refer to the learned and eloquent opinion in *State v. Flinn*, 158 W.Va. 111, 208 S.E.2d 538 (1974), authored by Justice James Sprouse. *Flinn* offers guidance in determining the level of scrutiny to give to statutes when considering claims of unconstitutional vagueness.

In *Flinn*, this Court held that a statute criminalizing "contributing to the delinquency of a minor" was—in the most part, but not entirely—constitutionally acceptable. We disagreed with the contention that the entire statute was impermissibly vague.

■ Syllabus Points 1, 2, 3, and 4 of *State v. Flinn* state:

> 1. A criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication.
>
> 2. Statutes involving a criminal penalty, which govern potential First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certain-

ty and definiteness by interpreting their meaning from the face of the statute.

> 3. Criminal statutes, which do not impinge upon First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certainty and definiteness by construing the statute in light of the conduct to which it is applied.
>
> 4. "When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment." Point 3 Syllabus, *Willis v. O'Brien*, 151 W.Va. 628, 153 S.E.2d 178 [1967].[4]

In *Flinn*, we found that statutory language that defined a delinquent child as one who "associates with immoral or vicious persons" or who "deports himself so as to wilfully injure or endanger the morals or health of himself or others" was unconstitutionally vague—because this language could be facially interpreted as encompassing innocent or constitutionally protected activities. We concluded, however, that other prohibitions of the statute were sufficiently clear and narrow so as to give no constitutional offense.

■ Turning to the instant case, we recognize that laws that criminalize behavior in the context of caring for an incapacitated adult may implicate constitutionally protected, sensitive, or socially desirable behavior. For example, numerous constitutional protections surround the family relationships that are often present in situations involving the care of incapacitated adults. And it cannot be disputed that it is socially desirable for people to take care of incapacitated adults.

Therefore, following *Flinn*, laws like the one we consider in the instant case are properly subjected to careful scrutiny, to ensure that they are not so vague or broad that they improperly include, impair, punish, or chill protected or desirable behavior.

While the appellants contend generally that the statutory terms "abuse" and "ne-

---

4. This is the standard of review that we apply to the appellants' claim that *W.Va.Code*, 9–6–1(5) [1984] is unconstitutionally vague.

glect"—including these terms' statutory definitions—are unconstitutionally vague, the appellants do not suggest specifically how these terms, or any other language in the statute, are in fact impermissibly vague.

To our eye, the statutory language in question, given the definitional sections, is reasonably clear and specific.[5] We are not cited to any other jurisdiction finding that similar statutory language is unconstitutionally vague. It is instructive that in the *DeBerry* case, *supra*, we did not find the term "neglect" to be unconstitutionally vague.

We conclude that the language of *W.Va. Code*, 9–6–15(b) [1984] and its associated definitional sections should leave no doubt in the mind of a reasonable person as to the clearly undesirable, even reprehensible, conduct that is declared to be subject to criminal prosecution and penalty. And the statutory language does not facially sweep so broadly as to arguably include, chill, or penalize socially desirable or protected conduct.

Therefore we hold that *W.Va.Code*, 9–6–15(b) [1984] is not unconstitutionally vague and violative of *U.S. Const.* amend. XIV, Sec. 1, or of *W.Va. Const.* art. III, Sec. 10 or Sec. 14. Thus the circuit court did not err in denying the appellants' motion to dismiss the indictments on this ground.

We next turn to the appellants' argument that the indictments should have been dismissed because the indictments did not inform the appellants with specificity of the charges against them. (In part, appellants' argument challenging the constitutionality of *W.Va.Code*, 9–6–15(b) [1984] is restated in their presentation of this issue; and we incorporate our discussion *supra* accordingly.)

■ The purpose of an indictment is to plainly inform the defendant of the nature of the crime charged and to protect him against further or double jeopardy. *State v. Manns*,

174 W.Va. 793, 799, 329 S.E.2d 865, 872 (1985).

■ In *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996), we stated in Syllabus Points 1 and 2:

1. Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure requires that a defendant must raise any objection to an indictment prior to trial. Although a challenge to a defective indictment is never waived, this Court literally will construe an indictment in favor of validity where a defendant fails timely to challenge its sufficiency. Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or for which the defendant was convicted.

2. Generally, the sufficiency of an indictment is reviewed *de novo*.[6] An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations.

■ Syllabus Point 3 of *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983) states:

An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.

■ The language in the indictments in the instant case references and tracks the language of *W.Va.Code*, 9–6–15(b) [1984] and related definitional statutes. Moreover, the appellants received a Bill of Particulars that set forth details of how the prosecution claimed the appellants had violated the law. We think that the appellants were apprised of the charges against them so that they could fairly defend against the charges, and

---

**5.** "Neglect" is defined as:

(i) the failure to provide the necessities of life to an incapacitated adult with intent to coerce or physically harm such incapacitated adult or (ii) the unlawful expenditure or willful dissipation of the funds or other assets owned or paid to or for the benefit of an incapacitated adult[.] *W.Va.Code*, 9–6–1(3)[1984].

"Abuse" is defined as: "the infliction or threat to inflict physical pain or injury on or the imprisonment of any incapacitated adult." *W.Va.Code*, 9–6–1(2) [1984]. The appellants were not convicted of a conduct with an intent to "abuse."

**6.** This is the standard of review we apply to this issue.

they were fully protected from double jeopardy. Therefore, the circuit court did not err in refusing to dismiss the indictments on the grounds of lack of specificity.

■ The appellants also contend that the indictments should have been dismissed because they used language in the disjunctive ("or"), as opposed to the conjunctive ("and").

The indictments stated, in pertinent part:

[the appellants] committed the offense of "Neglect and abuse of an incompacitated [sic] adult" while having the actual care, custody or control of Norman Carlson, an incompacitated [sic] adult, with the intent to abuse *or* neglect such adult, did unlawfully, wilfully and feloniously create an emergency situation for said Norman Carlson.

[Emphasis added].

A straightforward reading of the statutory language at issue in the instant case indicates that the central element of the offense that the appellants were charged with committing is the *creation of an emergency situation* for an incapacitated adult, by a caretaker who has a particular intent at the time they create the emergency. That intent may be either the intent to abuse or the intent to neglect the incapacitated adult—or both. Thus, *W.Va.Code*, 9–6–15(b) [1984] created one offense that may be committed—as to the requisite intent—in three alternative methods or manners.

We have recognized that an indictment that states offenses in the disjunctive may result in an unfair and prejudicial uncertainty in the indictment, if the disjunctive language results in a defendant not being fairly apprised of what charges against which he or she must defend. *See State v. Loy*, 146 W.Va. 308, 119 S.E.2d 826 (1961).

However, we have also recognized, as stated in Syllabus Point 2 of *State v. Loy*, that:

[t]hough separate criminal offenses charged in the same count of an indictment should be stated in the conjunctive, it is generally not error to use the disjunctive where only the method or manner of the commission of an offense is charged.

In the instant case, the disjunctive language in the indictments states alternative manners in which the appellants allegedly committed the offense of creating an emergency situation for an incapacitated adult. This use of the disjunctive, then, falls within the "method/manner" category of a use of the disjunctive that is "generally not error," as stated in Syllabus Point 2 of *State v. Loy*.

Moreover, the appellants were apprised in a Bill of Particulars of the prosecution's intended evidence showing how the prosecution intended to prove the elements of the offense charged. The prosecution cited evidence that they claimed showed both an "intent to neglect" and "intent to abuse." (However, as previously noted, at the close of the prosecution's evidence, the prosecution elected to go to the jury only claiming an "intent to neglect.")

The appellants have not directed us to any specific fashion in which they were unfairly prejudiced by the disjunctive language in the indictments, and we do not see any such prejudice. We find therefore that the circuit court did not err in refusing to dismiss the indictments on the grounds that they used disjunctive language.

The appellants lastly contend that the evidence introduced at trial was insufficient to sustain a conviction under *W.Va.Code*, 9–6–15(b) [1984].

■ In reviewing the sufficiency of the evidence to support a criminal conviction, this Court follows the standard articulated in Syllabus Point 1 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found

the essential elements of the crime proved beyond a reasonable doubt.[7]

The appellants contend that the prosecution failed to offer sufficient evidence to prove three elements of the crime beyond a reasonable doubt: (1) that the appellants had "actual care, custody or control" of Norman Carlson; (2) that Norman Carlson was "an incapacitated adult;" and (3) that the appellants had the "intent" to neglect or abuse Norman Carlson.

*Webster's New Collegiate Dictionary* defines "care" as "to give care (such as to care for the sick), charge or supervision." *Webster's* defines "control" as "to have power over or the power or authority to guide or manage." Finally, "custody" is defined as the "power or authority to guide or manage."

■ On the "care/custody/control" issue, the jury could have found that Norman Carlson was residing with the appellants at the time of the incident, and had been there for some time. A nurse who worked with Ardyce Bull stated that Mr. Carlson had visited Davis Memorial Hospital with Ardyce Bull at least 3 weeks prior to the incident. Although Michael Bull's mother, Eva Bull, claimed that Norman Carlson was only "visiting" the Bulls, Eva Bull had also testified at a hearing that all of Mr. Carlson's belongings had been packed with him when he went to the appellants' house. Additionally, Mr. Carlson had lived with the appellants when they resided in Texas, from December, 1990 through October, 1993. Mr. Carlson's sister testified that Mr. Carlson had not lived alone since his wife passed away in 1990 and was not able to do so.

The statute does not specify that care, control or custody means a legal guardianship, or that such care, etc. must have gone on for a lengthy period of time. The evidence was more than sufficient for the jury to conclude that the appellants had actual care, custody or control of Mr. Carlson in mid-June of 1994.

■ On the "incapacitated" issue, the appellants fail to direct the Court's attention to any relevant portions of the record to sustain their proposition that Mr. Carlson was not an incapacitated adult. We will not belabor the ample evidence permitting the jury to find that Norman Carlson was an incapacitated adult.

On the "intent" issue, as discussed *supra*, the State elected to drop the "with intent to abuse" allegation, and to send the case to the jury alleging only an "intent to neglect." Therefore, any claim of insufficiency of evidence to prove an intent to abuse by the appellants is irrelevant to the issues before this Court.

■ The remaining issue is thus whether there was sufficient evidence showing that the appellants had an intent to neglect Mr. Carlson—and that having such an intent, they created an emergency situation for Mr. Carlson.

The evidence showed that the appellants intentionally left Mr. Carlson alone in their home during a period of extremely hot weather, while the appellants remained in Pennsylvania for several days.[8] Dr. Bull had stated that her father's mental condition had been deteriorating for several years. As previously noted, there was ample evidence that Mr. Carlson was *evidently and obviously*—at the time the appellants left him alone—a substantially disabled and incapacitated person, who could not properly and

---

7. This is the standard of review we apply to this issue.

8. Michael Bull and his mother testified that the Bulls had gone to Pennsylvania on Friday, June 17, and that Michael Bull had come back to the house on the next day, Saturday, to return some breakables. But none of the Bulls' neighbors could testify that they had seen Michael Bull there on Friday or Saturday. Nor was there any other indication that anyone other than Mr. Carlson was in the Bulls' house from Thursday, June 16 through Monday, June 20.

Both Michael Bull and his mother testified that Mr. Carlson's mental and physical condition, prior to the appellants' going to Pennsylvania, was essentially fine—and that Mr. Carlson was not incapacitated in any serious fashion, that his hygiene, etc. was also fine. Ardyce Bull did not testify. The testimony of Mr. Bull and his mother was so inconsistent with much of the other evidence that the jury was entitled to believe that they were simply not telling the truth.

safely care for himself. Moreover, there was a permissible inference to be drawn from Mr. Carlson's condition when he was found that Mr. Carlson had been neglected for a substantial period of time, even before the appellants left him alone.

 Justice Thomas Miller ably discussed the nature and proof of intent in his concurrence to this Court's opinion in *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 726–728, 246 S.E.2d 907, 925 (1978), *superseded by statute as recognized in Bell v. Vecellio & Grogan, Inc.*, 197 W.Va. 138, 475 S.E.2d 138 (1996). Justice Miller stated:

Generally, the law recognizes that intention can be ascertained either from verbal or nonverbal conduct of a party. The simplest proof is where the actor admits he consciously intended his conduct to produce the result it did.

The more usual situation is where intention must be inferred from a person's conduct. Here, the inquiry is directed at the degree of probability that the conduct will produce a given result. The higher degree of probability that a given result will follow, the greater the intention is inferred from the conduct.

The link between the conduct and the resulting harm is not only a causative inquiry, but includes another factor by which the conduct is judged—the degree of seriousness of harm. Conduct which carries a high probability that serious harm will result is high on the scale of intentional conduct. Finally, the standard by which the conduct and its resulting harm is judged to determine its "intentional" characteristics is not only the subjective knowledge of the individual, but what would be known by a reasonable person.

It is apparent that because intent is measured by the degree of harm occasioned by given conduct, the law labels both the conduct and the intent. Thus we speak of negligent conduct, meaning it is at the bottom of the intent scale, which is to say conduct that is not intentional. At the far end of the scale is the type of intent necessary for first degree murder, which is beyond the concept of malice and involves deliberation and premeditation—the specific intent to kill [footnotes omitted].

Justice Miller further stated in *Mandolidis*, 161 W.Va. at 727 n. 5, 246 S.E.2d at 925 n. 5:

Justice Holmes discusses the question of intent in both the criminal and intentional tort fields in O.W. Holmes, *The Common Law* (1881). He traces the historical precedents and arrives at a parallel conclusion: "The test of criminality in such cases is the degree of danger shown by experience to attend the act under the circumstances," *Id.* at 75, and as to intentional wrongs: "In general this question will be determined by considering the degree of danger attending the act or conduct under the known circumstances ." *Id.* at 162. W. LaFave & A. Scott, *Criminal Law* §§ 28, 30 (1972), extensively discuss the concept of intent from a criminal and civil standpoint. In summarizing as to the former, they state: "Intent has traditionally been defined to include knowledge, and thus it is usually said that one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts. *Id.* at 95–96."

Applying the foregoing reasoning to the facts of the instant case, the jury could have reasonably found that the appellants had knowledge (it should be remembered that Ardyce Bull is a physician) of the danger and physically harmful conditions into which they placed a demented, frail, elderly man—by abandoning him and leaving him alone, with no arrangements for him to be nourished, in dangerously hot weather, in an inadequately furnished house, without even making arrangements for a neighbor to look in—and that the appellants disregarded this apparent and obvious danger and harm, thereby in fact causing Mr. Carlson to suffer in a frightening, degrading, physically harmful, and life-threatening emergency situation.

The combination of the strong evidence showing the basis which the appellants had for appreciating the risk and actual physical harm to Mr. Carlson in that emergency situation—and the extreme gravity of the physical harm that occurred to Mr. Carlson—

added to by the additional evidence of a pattern of physically harmful neglect over a substantial period of time—permitted the jury to conclude that the appellants' misconduct rose to the level of intentionally causing physical harm to Mr. Carlson, so as to create an emergency situation for him. This met the statutory definition of neglect.

Therefore, the circuit judge did not err in denying the appellants' motion to grant a judgment of acquittal, based on a failure of the evidence to establish requisite elements of the offense.[9]

## IV.

### Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

---

9. Careful scrutiny by courts of the sufficiency of the evidence presented to prove charges of criminal neglect or abuse of an incapacitated adult by a caregiver is entirely appropriate. For example, if the circuit court in the instant case had concluded at the end of the evidence that the conduct of the appellants—making all permissible inferences in favor of the prosecution—did not rise to the level of intentional misconduct required by the statute, the court was required to grant a motion for judgment of acquittal. In fact, the circuit court did take substantial time to assess the evidence in this fashion, stating that while the question was "very, very close," the evidence was sufficient to go to a jury on the intent to neglect issue. We find that the circuit court did not err in making this judgment.